BILLINGS *et al. v.* ASPEN MINING & SMELTING Co. *et al.*

(*Circuit Court of Appeals, Eighth Circuit.* July 5, 1892.)

No. 30.

1. MINING CLAIMS—CAPACITY OF ALIENS TO HOLD.
    An alien who has expended time, money, and labor in exploring for and locating a mining claim on public lands, conjointly with others, may hold his interest, or recover the same if deprived thereof, as against his colocators, and as against all the world except the United States, though Rev. St. § 2319, confines the right of exploration, purchase, and occupation of unsurveyed mining lands to citizens of the United States, or persons who have declared their intention to become citizens.

2. SAME—INHERITANCE BY ALIEN—STATE AND FEDERAL LAWS.
    The question whether an alien can inherit an interest in a mining claim located upon government lands is determined, not by the federal law, but by laws of the state in which the mine is situated; and under Acts Colo. Nov. 4, 1861, and April 2, 1887, aliens may inherit mining claims located in that state.

3. CANCELLATION OF DEED—MISREPRESENTATIONS.
    Where persons living in a foreign country or a distant state, and having no independent means of knowledge, are induced to convey an interest in a mining claim for a grossly inadequate consideration, on the representation of the purchaser's agent that they have no real interest therein, and that he desires the conveyances merely for the purpose of fortifying his own title against pending litigation, such conveyances will be set aside, though the representations were honestly made.

4. SAME.
    But where a person living in an adjoining state refuses to make a deed on such representations, and causes inquiries to be made in her behalf and receives independent information, and then makes a conveyance for a much larger consideration, she is concluded thereby, though the consideration is still inadequate.

**5. SAME—LACHES.**

A delay of three years after making the first-mentioned deeds did not, in such case, constitute laches, it appearing that, soon after executing the same, the grantors conveyed the same interest to a third person in trust to enable him to take proceedings for the recovery thereof, knowledge of which fact was promptly brought home to the purchaser, and that the delay of the trustee was not caused by the grantors.

**6. SAME—NECESSARY PARTIES.**

The said trustee having entirely failed to take such proceedings, he should be made a party defendant in a suit brought by the grantors themselves to recover their interest, since defendants are entitled to be protected by the decree against any subsequent demand on his part.

**7. SAME.**

It was error to refuse a petition by the representative of a deceased daughter of the alien to become a party complainant, since the decree should be in such shape as to settle the rights of all parties claiming under such alien.

**8. SAME—INNOCENT PURCHASER.**

The purchaser having conveyed the title thus acquired to a corporation of which he was the president and principal stockholder, the corporation was not an innocent purchaser, especially as the records of the county in which the mine was located showed that the alien was one of the original locators; and the fact that after his death one of his colocators published a notice to him or his administrators, notifying them to pay his share of the outlay expended for holding the claim, on pain of a forfeiture of his interest, could not render the corporation an innocent purchaser, it appearing that it must have known that the publication was against a dead man, and without effect.

**9. SAME—NECESSARY PARTIES.**

The fact that defendant corporation had conveyed a portion of the claim to another mining company did not render the latter a necessary party; for, while no decree could be entered affecting its rights, a final determination could be had of all the issues between the actual parties.

**10. CANCELLATION OF DEED—TENDER OF PURCHASE MONEY.**

In a suit to cancel conveyances of an interest in a mine, plaintiffs need not tender a return of the purchase money, where it appears that, in case of a decree in their favor, defendants would be required to account for past profits far in excess of the purchase price; for such price can be credited to them in the accounting, and their interest thus fully protected.

Appeal from the Circuit Court of the United States for the District of Colorado. Reversed.

*T. A. Green* and *Nix & Norlin*, for appellants.

*George J. Boal, Aaron Heims,* and *T. H. Edsall,* (*Geo. D. Reynolds,* of counsel,) for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge. The bill in this cause was filed in the circuit court of the United States for the district of Colorado, for the purpose of asserting the rights of the complainants, as heirs at law of one William James Wood, to an interest in a mining property situated in Pitkin county, Colo., and known by the name of the "Emma Mine." Previous to April, 1870, William James Wood resided at Owen Sound, in Canada, being a subject of Great Britain. On April 10, 1870, he came to the United States for the purpose of bettering his financial condition and prospects, leaving at Owen Sound his wife and family, save one son, George, who accompanied him to the United States. The father and son went to Greenwood county, Kan., in which county the father preempted certain of the public lands, and lived thereon for some time, going thence to Colorado. On the 24th day of April, 1880, the said William J. Wood, Archie C. Fisk, and Andrew Kirkpatrick discovered and

located the mine afterwards known as the "Emma Mine," and caused the same to be duly surveyed, and the boundaries of the claim to be marked with posts, and prepared and had filed in the recorder's office of Pitkin county a proper location certificate, as required by the provisions of the statutes of the United States, the same being filed July 26, 1880. In October, 1880, Wood died at Leadville, Colo., intestate, leaving as his heirs his widow, Margaret, and his children, George, William H., Orman James, Matilda, Charles E., Thomas E., and Hiram A. In 1881, George Wood died in Kansas, leaving a widow, Margaret, surviving him, who has since married James Cavner. Matilda Wood married William Scott, and died in 1882. Archie C. Fisk in the spring of 1883 caused to be published in a newspaper a notice addressed to William J. Wood and his administrator, stating that he had expended on said Emma lode $100 for work and improvements done during the year 1882, and that repayment of his share must be made by said Wood within 90 days or his interest would become the property of said Fisk. When this publication was made Fisk knew of the death of his colocator Wood, but he did not attempt to give notice to his heirs. On the 3d day of March, 1884, the said Fisk conveyed his interest in the Emma mine to one John Hulbert, who made the purchase and took the conveyance for the use and benefit of Jerome B. Wheeler, who by other conveyances, not necessary to be stated in detail, had become possessed of the title of Kirkpatrick in the mine.

A claim was asserted to the Wood interest through one Almira Brown, who claimed to be the widow of William J. Wood, and who transferred an interest of one sixth to Emma Moody, wife of Henry Moody, and litigation was had over the claims thus asserted. It may be said, in passing, that the claim thus based upon the alleged relation of husband and wife between William J. Wood and Almira Brown seems to have been wholly without foundation. By reason, however, of this and other litigation, Jerome B. Wheeler, in 1885, deemed it necessary to fortify his claim to the mine by obtaining conveyances from the heirs of William J. Wood, and to that end James H. Devereux, agent for Wheeler, went to Owen Sound, Canada, with other parties acting in the same interest, and there ascertained that the widow of William J. Wood was still living, having since his death intermarried with William Billings. Henry Moody had gone to Owen Sound on the same errand, and it became a race of diligence as to which one should procure a deed or release from Mrs. Billings. The result was that Mrs. Billings executed a release of her interest in the mine for the sum of $2,500 to David Robertson, of Chicago, Ill., but in fact for the benefit of Wheeler, the deed bearing date April 15, 1885. Devereux then went to Chicago, and there succeeded in getting a release from James O. Wood, or Orman J., as he was christened, a son of William J. Wood, of his interest in the property for the sum of $230. Through the agency of one P. J. Connor, acting in the interest of Wheeler, who went to Port Arthur, Canada, for that purpose, a deed was obtained from Charles E. Wood releasing his interest in the mine for the sum of $266.66.

On the 18th of April, 1885, Mrs. Billings executed a deed of her interest in the Emma mining claim to Richard J. Doyle, "to hold the same upon the trusts and according to certain terms which have been declared between the said party of the first part and second part hereto." In the month of May following James O. and Charles E. Wood executed deeds of like import to Doyle, covering their interest in said mine, all of which deeds were placed on record in Pitkin county, Colo. These deeds were executed because the grantors claimed that they had been misled in releasing their rights to Wheeler, and their purpose was to have Doyle act in their behalf in asserting their claim to the property.

In November, 1885, Jerome B. Wheeler, with other parties owning interests in mining properties adjacent to the Emma mine, organized a corporation known as the Aspen Mining & Smelting Company, and on the 30th of November, 1885, Wheeler executed a conveyance of his interest and title in and to the Emma mine to said corporation. For some reason, not made apparent in the testimony, Doyle failed to bring any proceedings for the assertion of the rights of Mrs. Billings and her sons, and finally, in 1887, Mrs. Billings went to Colorado for that purpose; and on the 14th of April, 1888, the present proceedings were instituted, wherein Margaret Billings, James O. Wood, Charles E. Wood, and Margaret Cavner are complainants, and the Aspen Mining & Smelting Company, Jerome B. Wheeler, Clinton Markell, Thomas E. Wood, William Wood, and Hiram A. Wood are named as defendants. It appearing that William Wood was insane, and that Hiram A. was a minor, William E. White was appointed guardian *ad litem* for them, and filed an answer in their behalf, claiming that each of the named parties was, and continued to be, the owner of an undivided one thirty-sixth interest in the Emma mining property, and therefore joined in the prayer of the bill for an accounting. Thomas E. Wood answered the bill, asserting that he was the owner of one thirty-sixth interest in said property, and likewise joined in asking for an accounting from Wheeler and the Aspen Company. At the November term, 1889, William G. Scott, as the representative of the interest of Matilda Scott, deceased daughter of William J. Wood, sought to be admitted as a complainant in the proceedings, but his petition in that respect was denied; and at the same time, on motion of complainants, the bill was dismissed as to Clinton Markell. On the 10th day of May, 1890, the cause was finally heard upon the issues presented by the bill, the answers of Jerome B. Wheeler, and of the Aspen Mining & Smelting Company, the replications thereto, with the evidence adduced on behalf of all the parties, and on the 20th of October, 1890, a decree was entered dismissing the bill upon the merits. Thereupon the cause was appealed to this court by the complainants, and has been finally submitted, after full argument, by counsel for the respective parties.

The first position taken by counsel for the defendants is that it is necessary for the heirs of William J. Wood to prove that when he joined with Fisk and Kirkpatrick in the location of the mine, in 1880, he had become a naturalized citizen of the United States or had properly de-

clared his intention to become such. By section 2319 of the Revised Statutes, it is enacted that "all valuable mining deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase by citizens of the United States, and those who have declared their intention to become such," etc., and the contention of counsel is that as it is not denied that, when Wood came to the United States in 1870, he was then a subject of Great Britain, his heirs must show that he had become a naturalized citizen of the United States, or had declared his intention to become such before the location of the Emma mine, in the spring of 1880, before they can assert title to the mine through him. It would certainly be inequitable to rule that if Wood were living his colocators, Fisk and Kirkpatrick, or any one claiming under them, could deprive him of his interest in the mine simply because he was an alien. To hold that, after Wood had expended time, labor, and money in prospecting for and locating the mine conjointly with them, they could oust him therefrom, or refuse him the right of participating in the proceeds thereof, would be nothing short of legalized robbery. His alienage, if it existed when the mine was located, would not have the effect of transferring his interest to his colocators. The United States might, by proper proceedings, have deprived him of the benefits of the location made by him, but Fisk and Kirkpatrick could not avail themselves of the right of escheat belonging to the government. Thus in *Craig* v. *Leslie*, 3 Wheat. 563, it is said:

"Now, what is the situation of an alien? He can not only take an interest in land, but a freehold interest in the land itself, and may hold it against all the world but the king, and even against him, until office found, and he is not accountable for the rents and profits previously received."

In *Cross* v. *De Valle*, 1 Wall. 1, the question arose on the following facts: One Halsey by will devised real property situated in Rhode Island to trustees for the benefit of his daughter, Maria De Valle, who was a native and resident of Buenos Ayres, and upon her death the property was to go in fee to her children, provided they should, within five years after being informed of the decease of their grandfather, take up their permanent residence in the United States; and in event of their failure so to do, then, after payment of certain legacies, the residue of the property was to be conveyed to one Cross upon certain conditions. A statute of Rhode Island provided that "courts of probate shall have power to grant petitions of aliens for leave to purchase, hold, and dispose of real estate within their respective towns, provided the alien petitioning shall, at the time of his petition, be resident within this state, and shall have made declaration, according to law, of his intention to become a naturalized citizen of the United States." Cross filed a bill in equity in the circuit court for Rhode Island against the trustees and beneficiaries named in the will, setting forth that the trusts in favor of Mrs. De Valle and her children had failed by reason of their alienage and inability to hold real estate in Rhode Island, it not appearing that they or any of

them had ever petitioned for such right or declared an intent to become a citizen of the United States; that consequently the devise in the will to him took effect when the will was probated, and relief in various forms was prayed.

The supreme court held that Mrs. De Valle, notwithstanding her alienage, took an equitable life estate by the will, defeasible only by action of the sovereign, upon what was declared to be a familiar principle of law, to wit: "That an alien may take by deed or devise, and hold against any one but the sovereign, until office found." In *Osterman* v. *Baldwin*, 6 Wall. 116, Baldwin, a citizen of New York, asserted a title to land in Texas acquired by purchase from the Galveston City Company in 1839, before the admission of Texas into the Union. The constitution of Texas prohibited aliens from holding real estate in that country, and this prohibition was relied on as a defense to the suit brought by Baldwin in 1850 to establish his title to the lands. In deciding the case, the court held:

"It is true, as the defendants insist, that when the purchases were made by Baldwin, Texas was a foreign country, with a constitution forbidding aliens to hold real estate. But the defendants cannot object on that ground. Until office found, Baldwin was competent to hold land against third persons. No one has any right to complain in a collateral proceeding if the sovereign does not enforce his prerogative."

Turning next to the provisions of the law of the state of Colorado, we find in the constitution of the state, adopted in 1876, the declaration that "aliens, who are or may hereafter become *bona fide* residents of this state, may acquire, inherit, possess, enjoy, and dispose of property, real and personal, as native-born citizens." Article 2, § 27.

By an act of the legislature adopted November 4, 1861, it was provided that—

"All aliens may take, by deed, will, or otherwise, lands and tenements, and any interest therein, and alienate, sell, assign, and transmit the same to their heirs, or any other persons, whether such heirs or other persons be citizens of the United States or not; and, upon the decease of any alien having title to or interest in any lands or tenements, such land and tenements shall pass and descend in the same manner as if such alien were a citizen of the United States. * * * The personal estate of an alien, dying intestate, who at the time of his death shall reside in this state, shall be distributed in the same manner as the estate of natural-born citizens; and all persons shall be entitled to their proper distributive shares of such estate under the laws of this state, whether they are aliens or not."

By an act approved April 2, 1887, (amended April 18, 1889,) nonresident aliens and foreign corporations and syndicates were prohibited from acquiring title to any body of agricultural, arid, or range land exceeding 2,000 acres in quantity, but by section 5 of this act it was declared that "this act shall not be so construed as to prevent any nonresident alien * * * from acquiring the title to and possessing and working any of the mines in this state."

It thus appears that, if Wood were living and had brought a proceeding for the enforcement of his title and right to an undivided one-third

interest in the Emma mine against the present defendants, they could not object thereto, either under the laws of the United States or of the state of Colorado, on the ground that he was an alien, that being a privilege reserved to the sovereign only.    At the time of his death he held and possessed a right and title indefeasible as against all the world, save the sovereign, and defeasible by the latter only by direct proceedings for that purpose.    The title and interest thus possessed by Wood passed, at his death, to those who by the laws of the state of Colorado were capable of inheriting property in that state.    Thus, in *U. S.* v. *Fox*, 94 U. S. 315, it is said:

"The power of the state to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted.    It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated.    *McCormick* v. *Sullivant*, 10 Wheat. 202.    The power of the state in this respect follows from her sovereignty, within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the federal government.    The title and modes of disposition of real property within the state, whether *inter vivos* or testamentary, are not matters placed under the control of federal authority."

In *Hanrick* v. *Patrick*, 119 U. S. 156, 7 Sup. Ct. Rep. 147, the general question was considered by the supreme court in a case wherein the defendant claimed that he was the only heir having inheritable blood, and therefore was entitled to the realty in dispute as against the plaintiffs, they claiming through an alien.    The land in dispute being situated in Texas, the supreme court held that the question whether the alien could inherit from the common ancestor depended upon the laws of the state of Texas.    Following the construction placed upon the various statutes of the state by the supreme court of Texas, it was held by the supreme court of the United States that the rule of the common law, that aliens are not deemed to be heirs at law, having no inheritable blood, was changed by the legislation of the state, which placed the alien upon the same footing as a citizen of the United States, and therefore the fact of alienage was not a bar to the vesting of the estate by descent.

As already shown, by the laws of the state of Colorado it is expressly enacted that an alien may take the title, by deed, will, or otherwise, to property, real and personal, and may transmit the same to his heirs, whether such heirs be citizens or not, and in the distribution of estates aliens shall stand upon the same footing as citizens of the United States. By section 910 of the Revised Statutes of the United States it is provided that "no possessory action between persons, in any court of the United States, for the recovery of any mining title, or for damages to any such title, shall be affected by the fact that the paramount title to the land in which such mines lie is in the United States, but each case shall be adjudged by the law of possession."    The evidence in the case

shows beyond controversy that Wood had become a resident of the state of Colorado, and was such at the time of the location of the mine and at the date of his death; and there is, furthermore, evidence tending to show that he had, while residing in Kansas, declared his intention to become a naturalized citizen of the United States.    If this was a proceeding on behalf of the government in the nature of office found, it would be necessary to consider this evidence in detail, as in that case Wood's rights would be dependent upon the question whether he had in fact declared his intention to become a citizen; but, as we have already shown, that question is wholly immaterial in this collateral proceeding between private parties.    It having been proven that Wood was in fact one of the original discoverers and locators of the Emma mine, it being so located upon the public domain of the United States, it follows, under the doctrine of the cases already cited, that no one could question his right therein on the ground of alienage, save the United States.    As to all third parties, Wood was, at the time of his death, the owner of the undivided one third of this mining property; and his property rights, he dying intestate, passed at his death to such parties as by the laws of Colorado were recognized as his legal heirs.    Being a resident alien of Colorado, his property, real and personal, passed one half to his widow, and the other half in equal shares to his children, the alienage of any one or all of these parties not being, under the laws of Colorado, a bar to taking property by descent in that state.    It thus appears that upon the death of William J. Wood, in October, 1880, his widow and children became lawfully vested with the title to an undivided one third of the mining property in dispute; and the next question to be considered is whether they, or any of them, have parted with or become divested of the title thus passing to them.

It appears that Wood left surviving him, as already stated, a widow and seven children.    It is not claimed that any conveyance, transfer, or release of the title or interest of Matilda, William H., Thomas E., or Hiram A. Wood was ever executed to the defendants or any of them. It is claimed, however, that the complainants, Margaret Billings, James O. Wood, Charles E. Wood, and Mrs. Cavner, formerly the widow of George Wood, have conveyed their interests and title to the defendants, or to other parties through whom the latter claim title, and the question to be determined is whether the conveyances made by these parties are valid and binding, or whether they were improvidently made, and under such circumstances as that the grantors can repudiate the same. The evidence introduced upon this branch of the case is very voluminous, and it will not be attempted to set forth the same in detail.    We will consider, first, the conveyance executed by Margaret Billings, formerly Mrs. Wood.    It is not disputed that when she executed the deed in April, 1885, she resided at Owen Sound, Canada, and had no personal knowledge of the mine, its value or condition, nor of her actual title or interest therein.    The evidence clearly shows that until Henry Moody and the agents of Jerome B. Wheeler visited her at Owen Sound she had no knowledge of the fact that when her husband died he was

the owner of an undivided one-third interest in the mining property now in dispute. All the information she had upon the subject up to the time she executed the deed of her interest was derived from the statements made to her by those who were endeavoring to procure a conveyance of her rights as cheaply as possible, and they knew she had no other information, and could not, at Owen Sound, procure information from any other party or source. All statements of fact made by them were made for the purpose of inducing her to execute the deed, and under such circumstances that it is not permissible for them to say that she should not have relied on them, but should have made other and independent inquiries and ascertained the facts for herself.

The record contains the testimony of all the parties who participated in the negotiations resulting in the execution of the deed by Mrs. Billings. The general purport of the whole can be fairly gathered from the evidence of William Masson, a witness called on behalf of the defendants. This gentleman is a practicing solicitor residing at Owen Sound, and was present at the interview had by Devereux with Mr. and Mrs. Billings when the deed was executed, having been retained by Devereux to prepare the deed and supervise its formal execution. His testimony impresses us favorably in respect to candor and fairness, and we feel entirely justified in relying upon his statements as showing the general nature of the representations made to Mrs. Billings, and which resulted in the execution of the deed of her interest in the property. This witness testified that Devereux stated to him, and repeated the same to Mrs. Billings, that Wood had, with others, located the mine, but that he had not paid his dues thereon, and consequently had been advertised out; and, further, that it was doubtful whether Wood had become a citizen of the United States, and hence the Wood heirs, including Mrs. Billings, had no interest or title in the mine; that owing to other litigation the parties he represented were willing to pay a reasonable sum for a conveyance from the Wood heirs, although they had no legal claim to the property; that the mine was valuable, but it was involved in litigation, and the conveyances from the Wood heirs were desired for use in defending against such litigation. It is entirely clear from the testimony of this witness that the understanding he had of the matter was that the Wood heirs had no claim or right to the property, and that whatever Mrs. Billings could get was so much clear gain, or, to use the exact language of the witness, "From the facts that I know of the case, I believe that Mrs. Billings dropped into $2,500 that she would not otherwise have gotten." From all the evidence introduced on behalf of the defendants, it is made perfectly plain that Devereux and those acting with him constantly insisted that the Wood heirs had no right or interest in the mine, and it is equally plain that Mrs. Billings finally consented to execute a deed because she believed the representations thus made were true. It is, under the circumstances of this case, immaterial whether Devereux knew the falsity of these statements or not. Even though he then believed them to be true, yet as it now appears beyond doubt that these statements were without foundation, and that

the Wood heirs held the title to one third of the property, equity will not permit the grantee in the deed to enjoy the benefits thereof when it appears that the grantor was induced to execute it through a total misapprehension of her right and title, which misapprehension was caused by the representations of the grantee or his agents, even though such untrue representations were at the time made in good faith. In such case the inequity would exist, not in the making the representations originally, but in claiming the benefit thereof after discovery that the other party had been misled, to her injury, by relying on the statements made for the purpose of inducing action on her part, which now appear to have been wholly untrue. Thus in *Wheeler* v. *Smith*, 9 How. 55, it is held that where the parties stand in unequal position, and one party, reposing confidence in the statements made by the other, surrenders rights without a proper understanding of them, the conveyance thereof will be set aside, even though there was no fraudulent intent on part of the person making the same. In *Smith* v. *Richards*, 13 Pet. 26, the rule is stated to be that a material misrepresentation, if relied upon, will justify setting aside a contract, even though innocently made, because thereby the contracting party is misled to his injury. The facts of the case at bar bring the same fully within the ruling of the supreme court in the case last cited, to wit, that a misrepresentation or mistake, innocently made, is ground for rescinding a contract, if the misrepresentation was about a material matter, if the other party relied thereon, having a right so to do, and was thereby misled to his substantial injury.

Mrs. Billings testifies that she was induced to execute the deed and other papers demanded of her, because she was led to believe that she and her children had no right or title to the property in question, and the testimony of all the witnesses confirms this. That the representations on this subject were made to her for the purpose of inducing her to release her rights is not questioned, nor that the same were in regard to a material matter. Devereux testifies that when he, acting for Wheeler, procured the execution of the deed and power of attorney by Mrs. Billings in April, 1885, the mine had then yielded over $300,000; and from the indications given by the ore then in sight, in his judgment, (which after events more than justified,) it would certainly produce as much more,— thus making the one-third interest belonging to the Wood estate worth in the neighborhood of $200,000, of which one half would belong to Mrs. Billings. If it be true, as testified to by Devereux, that he stated these facts in regard to the value of the mine to Mrs. Billings, it is made certain, beyond question, that she was induced to release her claim to this large sum for the comparatively small amount paid her, because she placed confidence in the statements so persistently made to her that she and her children had, in fact, no right or title in or to the mine or its products. Leaving out of consideration all the evidence on behalf of complainants, and giving force only to that on behalf of the defendants, no other conclusion is possible than that Mrs. Billings was induced to release her right to the property in question because she was made to

believe that she had no real or substantial interest therein, and this belief was intentionally created by the statements made by the agents of the defendant Wheeler.

When they were made, the parties acting for the defendant Wheeler well knew that Mrs. Billings had no information in regard to her rights, and could not possibly obtain any from any source then within reasonable reach, and that she must, from the very necessities of the case, rely upon the truth of the statements made to her. They cannot now be heard to say that she should not have relied on the statements thus made her, or that she cannot complain of the injury caused her by the reliance she placed in the truthfulness of those who certainly did their utmost to induce confidence on her part. Without further elaboration of this point, we hold that the evidence requires us to find that Mrs. Billings was misled to her serious injury when she was induced to deed away her right and title to the mining property in dispute for a wholly inadequate sum, and that the circumstances under which this action on her part was procured were such as to justify the conclusion that she should not be held bound thereby.

The deeds from the sons, James O. and Charles E. Wood, are voidable for the same reasons. They were clearly induced to execute them through the misrepresentations made them, and when they had no knowledge or just conception of the real effect of the action taken by them at the solicitation of the agents of the defendant Wheeler, as is evidenced by the small amounts they received for the deeds executed by them, being $230 in one case, and $266.66 in the other.

In regard to the conveyance executed by Mrs. Cavner, who was formerly the widow of George Wood, we think it must be held that she is bound thereby. The evidence shows that when she was asked to execute a deed for her interest she did not rely wholly upon the statements made her by Devereux. She was then a resident of Wichita, Kan., and she consulted with attorneys at that place, who wrote in her behalf to Leadville, Colo., and it was not until after the, reply had been received that she consented to make a deed. She demanded and received $2,500 for her interest, and we cannot say that she was not induced so to do by the matters contained in the letter received by her attorneys, which is set forth at length in the evidence. It clearly appears that she was not content to act upon the statements made her by Devereux, but she sought other advice and other means of information; and we are not justified in holding that she can now claim that she was misled by any confidence reposed in the statements made by Devereux.

The great length of this opinion compels us to deal very briefly with the other questions discussed by counsel. It is urged on behalf of the defendants that the parties complainant have been guilty of laches in the institution of these proceedings, in that substantially three years were allowed to elapse after the execution of the deeds made by Mrs. Billings and her sons before this suit was brought. Certainly, as against the minor and the son who is insane, such a plea is without force. On part of Mrs. Billings and her sons James and Charles, it appears that,

in a few days after they had executed the deeds in question, they took action indicating clearly that they did not propose to acquiesce in the wrong done them, and the evidence justifies the conclusion that knowledge thereof was promptly brought home to the defendant Wheeler. On the 18th of April, 1885, Mrs. Billings executed a deed of her interest in the mine to one Richard J. Doyle, which was duly recorded in Pitkin county, Colo., as were also deeds of like tenor executed by her sons Charles E. and James O. Wood and by Mrs. Cavner. The purpose of these conveyances was to enable Doyle to take proceedings for the recovery of their rights and interests. It is thus made clear that Mrs. Billings and her sons did not remain silent until after developments had shown a great increase in the value of the property conveyed by them, but they asserted that they had been misled within a very few days, and took immediate steps looking to the enforcement of their rights, to the knowledge of the defendant Wheeler. Why Doyle did not carry out the trust committed to him we cannot say, but it is clear that his failure to act was not caused by Mrs. Billings or her sons, and, as the present action was brought before the statutory bar of limitations had become applicable, we do not find anything in the record calling for the application of the doctrine of laches.

Neither do we think that the Aspen Mining & Smelting Company can be said to be an innocent purchaser for value of the interests of the Wood heirs in this property. That company was organized in November, 1885, Jerome B. Wheeler being the principal stockholder, an incorporator and president of the company, and also the grantor to the company of whatever title it received to the property in dispute. The records of Pitkin county showed that William J. Wood was one of the original locators of the mine. It is not made to appear in the pleadings or the evidence that the company was ignorant of the claims or rights of the heirs of William J. Wood. In the answer filed by the company, it is averred that Fisk published a notice in a newspaper at Pitkin, Colo., addressed to William J. Wood or his administrator, notifying them that payment must be made of their share of the outlay for the year 1882, or, in default thereof, Wood's interest would be forfeited to Fisk; and claim of title is based upon this averment. It cannot be questioned, however, that Wheeler and the company when they received deeds, the former from Fisk and the latter from Wheeler, knew that when this notice was published Wood was dead, and his title was vested in his heirs, whoever they might be, and that consequently the effort to forfeit Wood's interest by publishing a notice addressed to a man then known to be dead was wholly nugatory. To sustain the claim of being an innocent purchaser for value, it was incumbent upon the company to plead and prove the facts necessary to support the plea, and this it has not done.

It is further suggested that this proceeding cannot be maintained, because Mrs. Billings and her sons did not repay or tender back the money paid them by Wheeler before bringing this suit. This point cannot be urged against the heirs, who received nothing from the de-

fendants, and, as against Mrs. Billings and Charles E. and James O. Wood, we think the facts take the case out of the general rule invoked by defendants. Where it is sought to rescind a contract and obtain a retransfer of property, the party seeking such release must, ordinarily, place, or offer to place, the other party in the same position he would have occupied if the contract had not been made. In the case at bar, if complainants succeed in obtaining the relief they seek, the defendant Wheeler will have to account for such sums belonging to the Wood interest as it may be proven he received from such interest, and it cannot be presumed that he will be entitled to be actually paid any sum whatever by the complainants. In the accounting that must be had, Wheeler will be entitled to credit for the sums paid by him, and his rights can be, in this particular, fully protected in the final decree. *Thackrah* v. *Haas*, 119 U. S. 499, 7 Sup. Ct. Rep. 311.

In argument, counsel for the defendants raise the objection that the proper parties are not before the court, in that the Compromise Mining Company, to whom the Aspen Company conveyed part of the Emma mine, is not made a defendant, and further because Doyle, to whom Mrs. Billings and two of her sons conveyed their title and interest in trust, is not a party. It appears that the Compromise Company claims title to some four acres of the Emma mine location under a conveyance from the Aspen Company. Of course, any decree rendered in this cause as it now stands cannot affect the title of the Compromise Company; and, if it is the purpose of complainants to assert title to the realty conveyed to the Compromise Company, that company should have been made a party defendant hereto, in order that the one hearing and decree should dispose of the entire controversy. The rights, however, of the parties to the present proceeding, can be determined without the presence of the Compromise Company, and its absence, therefore, is not an insuperable objection to entertaining the bill in its present form. We think, however, that Doyle should be made a party to the proceeding, in order that any right or claim he may have may be settled in the final decree. He can be made a party defendant, and, if he does not enter a voluntary appearance, service by publication can be had, so as to confer jurisdiction over the property upon the court. This is necessary for the proper protection of the defendants. They should not be left subject to be again called to account by Doyle, after meeting the claims asserted by the widow and heirs of Wood. As Mrs. Billings and her sons conveyed their title to Doyle in trust, they should protect the defendants against any claim Doyle may assert, before they compel the defendants to account to them for the property transferred to Doyle in trust. The case should not be left in such shape that, after the defendants have been compelled to fully account to complainants, they may be again called to account by Doyle as the grantee of complainants, and for the protection of the defendants in this regard it is necessary that Doyle should be made a party to the suit. We are also of the opinion that the petition of William G. Scott for leave to join in the bill

as complainant, representing the interest of Matilda Scott, should have been granted in order that the one proceeding should settle the rights of all the parties claiming under William J. Wood.

The decree appealed from is therefore reversed at the cost of appellees, and the cause is remanded to the circuit court, with instructions to permit William G. Scott, as representative of Matilda Scott, deceased, to become a cocomplainant in the bill, and to require Richard J. Doyle to be made a defendant to the proceedings, in order that any right or claim he may hold to the property in dispute may be settled by the final decree herein; and when these steps have been completed a decree shall be entered canceling the deeds and powers of attorney executed by Margaret Billings, James O. Wood, and Charles E. Wood to David Robertson, James H. Devereux, or other parties, purporting to convey their interests in the mining property in the bill described, and which are set forth in the bill herein filed, said decree to declare and establish the right and title of the widow and children of William J. Wood to the one third of said Emma mining property as against the defendants Jerome B. Wheeler and the Aspen Mining & Smelting Company, and to direct a proper accounting between the parties upon the basis of the rights thus decreed.