SHARP v. BEHR et al.

(Circuit Court, E. D. Pennsylvania. April 19, 1905.)

No. 22.

1. MINES—ROYALTIES—ACCOUNTING.

Plaintiff being entitled by contract to a royalty of one dollar a ton on ore from certain mines, defendant wrote him, with reference to certain ore, that it would be necessary to reduce the royalty, and suggested 50 cents a ton. Plaintiff did not reply thereto, nor to that part of a subsequent account of royalties in which he was only credited at 50 cents a ton for this ore; but 2½ months thereafter, when a check was sent in accordance with the statement, he refused to accept it in full, claiming royalty at the contract rate. *Held*, that plaintiff's failure to so object to the reduction was insufficient to preclude him from subsequently claiming royalty at the contract rate.

2. SAME—ACCOUNTING—DEDUCTIONS—BURDEN OF PROOF.

Where a contract for royalty on ore provided that the amount should be determined by railroad shipping receipts, the burden was on defendants, seeking to discredit such receipts on an accounting, to justify the deductions claimed.

3. SAME—DEDUCTIONS FOR DIRT—EVIDENCE.

On an accounting of royalty payable under an ore-shipping contract, evidence *held* insufficient to establish that deductions made by defendant for dirt were justified.

4. SAME—OBJECTIONS—WAIVER.

Where plaintiff was entitled to royalties on ore shipped to defendants, the amount of the shipments to be determined by the railroad shipping receipts, and defendants' statements of shipments were without any specification, except as to one shipment, and plaintiff had no figures with which to verify the account, the record of shipments being all kept at defendants' place of business, plaintiff's failure to object to the account rendered was not a waiver of his right to subsequently claim that deductions made by defendants were improper.

5. SAME—AGREEMENTS—EXECUTED TRANSACTION.

Where a payment on account of royalties for ore shipped, made by mistake, was allowed to go unquestioned by defendants for nearly a year after the mistake was discovered, and in a subsequent statement plaintiff was again credited with such royalty, though at a reduced rate, and a payment was made, such acts constituted a confirmation of such royalty, precluding defendants from thereafter claiming that plaintiff was not entitled to such royalty.

6. SAME—LOANS—REPUDIATION.

Where plaintiff was credited by defendants with royalties on ore mined from two farms, and such credits, together with some cash, was permitted to remain in defendants' possession as a loan, on which interest was paid on semiannual balances, and on one occasion the account was reduced by payment of $1,000, defendants were not thereafter entitled to repudiate the transaction on the ground that the royalties were not justified.

7. SAME—CONTRACTS—DISAFFIRMANCE—ELECTION—DAMAGES.

A contract to convey certain real estate provided for payment of royalties to the grantor for a term of 20 years, unless the grantor should voluntarily leave the grantees' employment, and that, if the grantees at any time should fail to pay the royalties for ninety days after written demand, the grantor should be entitled to a reconveyance of the premises on paying the cost price thereof. *Held*, that where, after the grantees had discharged the grantor from their employment, he gave notice of forfeiture for nonpayment of royalties, he thereby elected to terminate the contract, and was not entitled to recover subsequent damages.

**8. Same—Consideration—Interest.**

Plaintiff conveyed certain real estate to defendants at an actual cost of $3,500, on defendants' agreement to pay certain royalties for a specified term from mines located thereon, if possession was obtained by defendants, and that, on failure to pay the royalties, plaintiff should be entitled to a reconveyance on payment of the cost price. *Held* that, defendants not having acquired possession because of an outstanding lease, on termination of the contract for failure to pay royalties they were entitled to interest on the repayment of $3,500.

**9. Same—Tender.**

Plaintiff, being only bound to reimburse defendants as a condition to a reconveyance, was not bound to tender the amount necessary therefor in advance of a settlement of the accounts.

In Equity. Exceptions to report of master.

W. B. Broomall and A. B. Geary, for plaintiff.

Nelson S. Spenser and Arthur G. Dickson, for defendants.

ARCHBALD, District Judge.[1] According to the views previously expressed in this case (117 Fed. 864) it was found that the defendants were in arrears for royalty due on ore mined from the Lancaster Farm to the extent of at least $14.40, on the strength of which it was held that the plaintiff was entitled to call for a reconveyance of the Fulton Farm, which he had originally owned, as provided by the fourth article of the agreement between the parties.[2] It is earnestly contended that this was a mistake, and as

---

[1] Specially assigned.

[2] The following is a copy of the agreement:

"Memorandum of agreement made this twenty-sixth day of September, 1891, between George W. Sharp, of the one part, and Herman Behr, Robert Behr, and Gustav Hewbach, trading as Herman Behr & Co., of the other part.

"First. George W. Sharp agrees to convey to Herman Behr & Co., for the consideration of one dollar, the premises described in a deed bearing date June 17th, 1891, and recorded in the office for recording deeds for Delaware county, in Deed Book 11, No. 7, page 238, made by James Fulton to George W. Sharp.

"Second. In consideration of said conveyance Herman Behr & Co. agree to pay to George W. Sharp a royalty of one dollar per ton of 2,240 pounds upon all ore shipped by them from their garnet mines in Bethel township, Delaware county, Pennsylvania, including not only the mines now owned or operated by Herman Behr & Co., but also the mines situated upon the property above mentioned, if possession thereof be obtained by Herman Behr & Co. The amount of shipments to be determined by the railroad shipping receipts.

"Third. The payment of royalties as above to continue for the term of twenty years, unless George W. Sharp shall voluntarily leave the employment of Herman Behr & Co. In case the said George W. Sharp shall die during the said period of twenty years, the royalty shall be reduced to fifty cents per ton and shall be paid to the wife, Martha Sharp, so long as she may live and no longer.

"Fourth. In case Herman Behr & Co. should at any time fail to pay the royalty for a period of ninety days after written demand for the payment of the same has been duly made of Herman Behr & Co. then George W. Sharp shall have the right to demand a reconveyance of the premises mentioned in the first article of this agreement upon his paying to Herman Behr & Co. the cost price thereof.

"Witness the signature of the parties hereto.          Herman Behr & Co.
                                                        "George W. Sharp."

the right to maintain the bill, with the other relief incident to it, depends upon the conclusion so reached, a reconsideration has been asked in the light of further evidence and argument.

The arrears in question arise out of the shipment of February 11, 1898, stated at $28\frac{1740}{2240}$ tons, on which the defendants allowed the plaintiff $14.40, or at the rate of 50 cents a ton, instead of $1, the royalty fixed by the agreement referred to. There is some dispute as to just where this particular ore came from; that is to say, whether from the "dump" or refuse heap, or from a stock of "brown ruby" which had been condemned and put to one side. I accept the latter view, but it is not important. It was undoubtedly a special lot, which was cleaned up and reclaimed by direction of the defendants from a larger lot which had been intended to be thrown away; five cars, or 60 tons, of the best of it on hand being ordered to be shipped for a certain purpose outside of their sandpaper business. The material thing, on which the defendants particularly rely, is that, in a letter to the plaintiff January 12, 1898, inquiring with regard to what it would cost to clean up the rest of it and the quantity of "clean stuff" it would be likely to yield, it is said:

"We have to calculate on a different basis on this lot, to come out entire, as we cannot use it for sandpaper."

Adding:

"It will be necessary to arrange royalty for this old lot, and we suggest a credit of 50 cents per ton. Awaiting your estimate, and further news, we remain, Yours truly, Herman Behr & Co."

The plaintiff answered this letter the next day, giving an estimate of the cost of cleaning and the probable yield, but made no response with regard to the proposed reduction in the royalty, and the matter was allowed to rest at that until January 5, 1899, a year later, when the defendants, in accounting to the plaintiff for the royalties for the year, in a letter of that date, say:

Below we beg to hand you the figures of royalties for 1898, viz.:

| | | |
|---|---|---|
| Tons, | 540 $\frac{1829}{2240}$ at $1.00 per ton | $540 60 |
| Brown ruby, tons, 28 $\frac{1774}{2240}$ at .50 per ton | | 14 40 |
| | | $555 00 |

Also royalty received from Fulton Farm, viz.:

Tons,       570 $\frac{600}{2240}$ at 75 cents per ton............... $427 76.

To this the plaintiff made prompt reply, objecting because he had not been allowed $1 a ton royalty on ore from the Fulton Farm, the same as he had been receiving, but saying nothing as to the reduction on the "brown ruby." Subsequently, however, on March 18, when a check was sent in accordance with this statement, the plaintiff refused to accept it as a payment in full, and merely receipted for it on account, claiming a balance of $14.40 still due. It is contended that the failure of the plaintiff to object to the reduction of the royalty, at the time it was suggested, was evidence of his acquiescence, on which the defendants had the right to rely, and to which he is therefore to be now held, and that this is confirmed by the fact that when the statement with regard to the royalties was received no question was made of it until over two months had

passed. It is to be remembered, however, that the defendants were held by a written agreement with the plaintiff to pay a royalty of $1 a ton, which could not be changed without he gave his direct consent, and this the mere failure to repudiate their proposition did not necessarily do. The only thing that can be urged is the suggestion by the defendants in that connection that they had to calculate on a different basis on this particular lot of ore, which they designed for a special use, in order to come out whole, in consequence of which it would be necessary to adjust the royalty upon it. If the parties were newly bargaining together for something which the one was to supply and the other to pay for, an assent to the price so nominated might be implied from silence. But the ore was the defendants' own, subject only to a royalty to the plaintiff, which was already fixed, and which was not a measure of its value, but was one means of compensating the plaintiff for his services as mine superintendent. Something more positive is to be expected, therefore, than in the ordinary case, and the plaintiff's silence is not to be taken as an acceptance or acquiescence, but rather the contrary. The proposition of the defendants was not made a condition of shipment, and the failure of the plaintiff to respond to it should not have misled them. It was passed over unnoticed, although everything else in the letter was answered, and the matter was allowed to rest at that by both parties. Considering that the burden was on the defendants to secure a definite agreement to modify the royalty, in order to be relieved from liability to the full extent of it, and that the subject apparently never passed beyond the negotiating stage, I do not see that the plaintiff was bound.

If not, the statement rendered in January following, and the failure of the plaintiff to at once object to it, amount to little. It is true that it is said, in Oil Co. v. Van Etten, 107 U. S. 325, 1 Sup. Ct. 178, 27 L. Ed. 319, that an account rendered, if not objected to within a reasonable time, may ripen into an account stated, which the opposite party cannot change, except for fraud, accident, or mistake, although this seems to be somewhat of an overstatement of the law. 1 Cycl. Law & Proc. 376; Perkins v. Hart, 11 Wheat. 237, 6 L. Ed. 463; Wiggins v. Burkham, 10 Wall. 129, 19 L. Ed. 884; Verrier v. Guillou, 97 Pa. 63; Lockwood v. Thorne, 18 N. Y. 285; Brown v. Kimmel, 67 Mo. 430. But the crucial time in the present instance was not so much when the account was rendered, as when, on March 18, payment was tendered under it; and this the plaintiff declined to receive or receipt for, except on account, claiming the balance which is now asserted as still due. The interval of 2½ months was certainly not an unreasonable one, so as to compel him to express his dissent sooner or be bound. Nor is this affected by the fact that he saw fit to object more promptly to the reduced royalty proposed on the ore from the Fulton Farm. He subsequently and within sufficient season, before any controversy had arisen, objected to all, and that was the way the subject was left, and the condition in which it comes up here. It is to be noted, further, that the defendants seek to enforce, not only a re-

duction in the royalty, but also in the amount, for alleged dirt, of which the plaintiff had no notice. Except his failure to object to the statement in question, which amounts to little, there certainly is nothing to show that he gave his assent to both.

But, as was observed in the former opinion, $14.40 was not the only default in royalty with which the defendants are chargeable, although, as there pointed out, it may be the only one that can be relied upon as the basis for a reconveyance; the proper steps by a prior demand not having been taken to make the other available. Whatever else was due, however, is to be considered in the present accounting, and it has its influence, also, in inducing a decree, by amplifying the default. It is important, therefore, to observe that there was an admitted shipment of 170 bags of ore (made in December, 1898, but not credited until February following), containing 32,300 pounds, gross weight, or 27,455 pounds, allowing 15 per cent. for dirt, as claimed by the defendants; and another of 158 bags, containing 32,000 pounds gross, or 27,200 pounds after a similar deduction, on which there would be due to the plaintiff, on the one basis $28.70, and on the other $24.39. None of this was included in the statement of January 5, 1899, a part of it at least having been shipped, and all of it credited, subsequently, and it is therefore unquestionably still due and owing, and was at the filing of the bill.

But, above and beyond this, it is contended by the plaintiff that the $569\frac{833}{2240}$ tons ($540\frac{1329}{2240}+28\frac{1744}{2240}$) reported January 5, did not correctly represent the shipments up to that date. These shipments, according to the railroad receipts, amounted to 1,576,055 pounds, from which the defendants deducted from 15 to 25 per cent. for alleged dirt, leaving a net 1,283,429 pounds as the basis of the tonnage which they acknowledge, and for which alone they claim to be bound. There is a slight error in this calculation; 1,283,429 pounds amounting to $572\frac{2149}{2240}$ tons, leaving $3\frac{1316}{2240}$ tons unaccounted for, which at $1 a ton makes $3.58. Without stopping over this, however, the larger question remains as to the right of the defendants to make the deductions which they have. According to the agreement between the parties, the shipments of ore were to be determined by the railroad shipping receipts, which, although not conclusive, are so far to be taken as correct that the burden is on the one who seeks to discredit them, and the defendants are therefore called upon to explain and justify the variations which they have made therefrom. Unobjected to, they may be said to stand as an account rendered, by which the defendants are bound, just as much as the counter statements on which they rely to conclude the plaintiff, if the rule on that subject is to be adhered to in all the strictness for which they contend. But, waiving that point, and conceding, as was before decided, that royalty was only to be paid for clean or refined ore, and not on dirt, as to which the shipping receipts, of course, afford no guide, the question is whether the defendants have successfully met the burden imposed upon them to show that dirt was actually shipped to the extent of the deductions which they have made. It was clearly pointed out in the former opinion that they would be re-

quired to do so, and there can be no just complaint, therefore, if they are. And this is particularly the case, in view of the plaintiff's testimony, which does not seem to be controverted, that the same pains were taken and the same course pursued with regard to cleaning the ore during these shipments as previously, with such facilities as the equipment of the mine afforded. Notwithstanding this, however, beginning with the very first of the year, and extending to every lot of ore received, there was a persistent dockage, ranging from 15 to 25 per cent., as to which there is no explanation, except the complaints to be found in two or three letters. But complaints are not necessarily true, and do not justify themselves; and the only thing that can be made out of them here is the possible inference that, because the plaintiff did not resent them, they must have been well grounded. Criticisms between employer and employé, however, are often indulged in, whether just or unjust, as a supposed incentive to greater effort; and it is a question whether, in this or any similar instance, they would be understood to mean more. Neither is it to be expected that one in a dependent position will reply and defend his work; it being his duty rather to satisfy his superior if he can, who is the one to determine the particularity which he requires. The failure to do so, therefore, is not to operate the same as where parties stand on an equal footing. Nor, except in the instance to be presently referred to, was there anything to suggest to the plaintiff that dockages were to be made; much less that his royalties were dependent upon them. It is, on the other hand, most significant that during the year in question the defendants were subject to sharp competition in the manufacture of sandpaper, for which this ore was utilized, enforcing greater care in the selection of abrasive material, and causing them to eventually give up the mine and seek it elsewhere, although with but little better success. It is evident, therefore, all things considered, that it is this that was at the bottom of the deductions, rather than any failure on the part of the plaintiff to mine and clean the material as he should—either a new standard being set up by the defendants to meet the exigencies of the business, or a change in the quality of the ore having occurred, with neither of which is he to be charged. At all events, taking the year as a whole, the defendants have nothing on which to rely, except the fact that, when they rendered an account of it to the plaintiff, he took no exception to the amount, and that, when payment was subsequently tendered in accordance with it, he made no claim that anything was due beyond the $14.40 already alluded to, receiving and receipting for all outside of this. But whatever inference this might warrant, or however the plaintiff might be held to it under some circumstances, I see no occasion for doing so here. The tonnage was given in gross in the statement, without any attempt at specification, except as to the "brown ruby," so called, and the plaintiff had no figures at hand by which to verify the account; the record of shipments being all kept in New York. It may be that he ought to have known in a general way the quantity which had been mined

and forwarded for the year, but that is not to conclude him from insisting upon the real extent of it, now that it appears.

It is said, however, that as to the shipments covered by the statement of June 20 the plaintiff had notice that the weights were intended to be adjusted according to the deductions there shown, as to which he was called upon to express himself, unless he expected to be bound. But in the main the same observations apply to this that have been already made. These deductions were imposed in the face of actual commendation, which goes far to negative their justice, if, indeed, it does not call in question the good faith of the defendants in making them. Thus, in the letter of April 25, acknowledging 1,011 bags of ore and giving the correct weight—116,265 pounds, instead of 120,000, according to the shipping receipts—it is said:

"The ruby gives satisfaction to the factory as far as they have gone. Color is good."

This was confirmed the next day by another letter:

"As expressed yesterday, the ruby looks very well—indeed, quite different from last year's; and we hope to catch up in business with its help."

And yet, notwithstanding this, 10 per cent. was subsequently taken off of the shipment referred to, and, not satisfied with that, after the statement of June 20 had been rendered, another deduction was made of 10 per cent. more. It is said that this commendation was of the color merely, and not of the quality; but that is not the way it reads. Besides, color is quality, as the very next letter shows. But, without stopping further over the correspondence (although there is great temptation to do so to bring out the other inconsistencies, as well as the competition in trade which the defendants were experiencing, which evidently lies at the bottom of all), the significant thing with regard to the statement in question is that, while seeking to hold the plaintiff up to it, the defendants do not themselves propose to stand by its terms. After submitting it to him, showing a deduction of 10 per cent. on the first three items, without further notice, and moved by what considerations they have not disclosed, the defendants proceeded to deduct 10 per cent. more. This makes a change in the shipment of April 25 three times—first, in correction of the railroad receipt reported to the plaintiff; next, in the statement of June 20; and finally, on the defendants' books, unknown to any one except themselves. The plaintiff is, of course, not affected by deductions of which he was not informed. And as to the rest, the only thing that can be said is that he did not object. No doubt this warrants the inference that he accepted them as correct; but in view of all the evidence, and particularly of the fact that the defendants, by shifting the figures as they have, instead of justifying, have themselves discredited them, it does not seem to me that it should be drawn. The treatment of these shipments is too much in line with those of the whole year to be any better received, and the tonnage shown by the railroad receipts must therefore prevail.

136 F.—51

· The quantity of material on this basis for which the defendants are liable amounts to 1,640,355 pounds, or $732^{675}/_{2240}$ tons. This varies slightly from the figures adopted by the master, due to his failure to follow the corrected shipment of April 25, which I accept. The royalties on it would be $732.30, upon which there is to be credited the payment of $555 March 18, 1899, leaving $177.30 due. This includes and covers the $14.40, as well as all the other items which have been discussed, which thus disappear in it, and do not need to be further noted. It represents the actual default of the defendants in the payment of royalties at the time the bill was filed, to which it thus lends support.

It is claimed, however, that the plaintiff had been paid, and had in his hands, royalties from the Fulton Farm at $1 a ton, amounting to a large sum, for which the defendants were not liable, and which should, therefore, be applied in liquidation of anything for which they were in arrears on the Lancaster Farm, leaving nothing due, and requiring a dismissal of the bill. But the subject of the Fulton Farm royalty was fully discussed in the former opinion and needs but a passing notice here. While the payment of it in my judgment· was a mistake, not only was it allowed to go unquestioned by the defendants for nearly a year after the mistake was discovered, but in the statement of January 5, 1899, the plaintiff was again credited, as we have seen, with similar royalty, although at the reduced rate of 75 cents, and a payment of $427.76 made. This was a distinct confirmation of what had been done, and it cannot now be disturbed. Assuming that it was a gratuity, a person may be bound by a completed gift just as much as by anything else, and that is what it was in effect. Indeed, it was virtually conceded by Mr. Dale at the former argument, as shown by my notes, that for these payments the defendants had no remedy. The plaintiff by no means agrees that this royalty was not due him, and, on the contrary, has all along contended that the payments made him were to be taken as a contemporaneous construction of the contract, by which the defendants are bound. I have not adopted that view, but it will be seen on what disputed ground we enter when once the question is opened, which the defendants by their final payment, when all the facts were known to them, have seen fit to close.

By a kindred argument it is further contended that the plaintiff is not entitled to recover the $2,000 which was left by him in the defendants' hands as a loan. The position taken is that this is mainly made up of royalties on ore from the Fulton Farm, which, not having been paid to the plaintiff, but only credited to him on the defendants' books, can now be repudiated. This account began in January, 1893, with what amounted to a loan to the defendants of $1,200 at 5 per cent., of which $701.32 was cash, and $498.68 royalty due on the Lancaster Farm for the preceding year. It was increased in January, 1895, by a credit of royalties from both this and the Fulton Farm, to $2,500; and in January, 1896, a year later, to $3,000, at which amount it stood for 3½ years, until July 1, 1899, when it was reduced by a payment of $1,000. Not all the

royalties accounted for, however, went into this loan—payments on account being made from time to time, and only the balances carried forward; interest being paid semiannually on what was found due. It is not necessary to go into the involved marshaling of credits and payments, by which it is sought by the defendants to individuate a part of this and give it the character of Fulton Farm royalties. No such distinction was preserved, and none can be imposed upon it here. It is only to be brought about by applying all payments made, to the satisfaction of Lancaster Farm royalties, contrary to the intention of the parties, for which there is thus no warrant. The money in the hands of the defendants, from whatever source derived, stood as a loan, and has to be treated just as if the royalties, of which it was made up, were actually paid over to the plaintiff in cash, and turned back to the defendants again for their use. To that extent the transaction was a closed one—not so, perhaps, but that it could be reached and adjusted in equity, if need be; but there is no call or occasion for doing so. The whole amount must therefore be treated as due and owing by the defendants in arriving at the true state of the accounts between the parties.

So far the conclusions which I have reached are adverse to the defendants. But with regard to the damages for failure to continue the mining operations on the Lancaster Farm, which were referred to the master to estimate, and for which he has allowed some $4,000, I find myself compelled to revise the opinion which I previously expressed. It is contended in support of this claim that the plaintiff's services were tied up for 20 years by the provision which only made the defendants liable for royalties so long as he remained in their employ, and on the strength of this the master has endeavored to fix the present value of these royalties on an estimate of what they would fairly amount to for the full term if mining operations were prosecuted with reasonable diligence, according to the implied obligation to do so. Pittsburg Railroad Co.'s Appeal, 99 Pa. 177; Aye v. Philadelphia Co., 193 Pa. 452, 44 Atl. 555, 74 Am. St. Rep. 696; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320. There are many factors which enter into any such problem; but, passing by the question whether the method adopted by the master was the correct one, the difficulty is in the argument which lies at the base of the claim. It is said that one of the confessed objects of the defendants in entering into the agreement was to secure the retention of the plaintiff in their service, and keep him out of the competition with them which might otherwise ensue if a man of his experience were in charge of mining operations on the adjoining Fulton Farm. But, whatever inducement or inspiring cause of this kind there was, it formed no part of the consideration contributed by the plaintiff, from which it is to be carefully distinguished, which consisted purely and simply in the conveyance of the farm, which he then owned and now seeks to get back. It is true that by the peculiar wording of the agreement it was made to his interest to continue at work for the defendants, so

long as they required it, as he did until he was discharged; and at. the former hearing he attempted to set up, although without success, an admitted undertaking, as he alleged, to retain him for the full term. Except, however, as he was thus constrained by self-interest, there was nothing to prevent him from leaving at any time,. and the defendants could not hold him. No doubt he would forfeit the royalties by so doing; but, if so, it would be a matter of his. own volition, of which he could not complain, nor would the consequences become, a part of the consideration moving from him on. which he could now rely.

In view of this, and without assenting to the contention of the defendants that the fourth clause of the agreement provided a special remedy for a breach, to which the plaintiff is confined—that is. to say, by a reconveyance of the property which he parted with in the transaction—I am satisfied that, having invoked this provision,. it measures the relief to which he is entitled. The notice of forfeiture and the demand for a reconveyance were in disaffirmance of the agreement, which the plaintiff thus elected to bring to an end.. This was a provision for his protection and benefit, of which he had the right to avail himself or not, as he chose; but, having taken steps in this way to terminate the contract and get back the consideration which he had contributed, and which must be regarded. as the legal inducement to the defendants in entering into it, he cannot maintain it against them, as though in other respects continuing in force. There can be no partial abrogation, in other words. The contract stands or falls as a whole. In Jones v. Carter, 15 Mees. & Welsby, 718, action was brought to recover rent alleged to be due on a mine lease. It appeared, however, that prior to the time when the rent accrued the plaintiff had served a declaration in ejectment on the defendant, alleging a failure to comply with certain covenants, whereby, according to the provisions of the lease, he had the right to re-enter and avoid it; and it was held that the mere starting of the ejectment, although it went no further,. was an exercise of the option to forfeit, after which no rent could be demanded. To a similar effect are Birch v. Wright, 1 Term Rep. 378, and Stuyvesant v. Davis, 9 Paige, 427. This principle is applicable here. Mr. Geary, as attorney for the plaintiff, on July 10,. 1899, and the plaintiff himself 2 days later, made demand on the defendants in writing for the royalties claimed to be due, and gave notice that, unless they were paid within 90 days, a reconveyance of the premises would be required according to the provisions of the agreement; and on February 26, 1900, the royalties not having been paid, the present bill was filed. This put an end to the agreement, and the plaintiff was entitled to nothing further under it,. outside of the reconveyance sought, and the damages, if any, which had been sustained, which, as it is to be observed, was all that was. contended for by Mr. Broomall at the former argument. This is not to deny that the plaintiff, had he desired to take that course, allowing the agreement to stand, instead of bringing it to an end by the demand for a reconveyance, could have brought suit from time:

to time for the royalties which he should have received upon a due prosecution of the mining, on the principle laid down in the former opinion, and not now intended to be departed from. But, undertaking, as he has, to get back what he put into the bargain, he must be content with that, together with damages up to the time he took steps to do so. The last shipment from the Lancaster Farm was on April 26, 1899, ten months prior to the filing of the bill. The master finds that the average annual quantity mined by the defendants, for the seven years that the agreement was in force, was 636 tons; and, accepting this as a fair approximation, there should have been mined in the ten months in question, to make up the quota, 530 tons, on which the plaintiff would be entitled to receive $530, which represents the damages which he sustained by the breach of the contract.

Turning to the other side of the account, the plaintiff, as was before decided, is bound to pay back to the defendants, as a condition of the reconveyance, what the premises cost them, which, as previously found, amounted to $3,500. It was suggested in the order of reference that this should be without interest, and the master has accordingly disallowed it. The idea was that the defendants, having had the benefit of the property, were fully compensated for the cost of it. But upon this point also I feel compelled to change my views. At the time of the conveyance from the plaintiff there was an outstanding mine lease, which has been kept in force by the exercise by the lessees of the option to renew which it contained; and all that the defendants have derived from the property in consequence, outside of the little which has come from the farm proper, which is negligible, have been the royalties which have been paid upon it, at the stipulated rate of 75 cents a ton, which have in turn been accounted for to the plaintiff at the advanced rate of $1 a ton, excepting only the final payment in January, 1899. Up to that date, therefore, the plaintiff having had all the benefits derived from the property, interest should certainly be allowed to the defendants on the money which they put into it at the time of their purchase. This only runs, as it is to be noted, up to January, 1899, since which time the defendants have received and retained the royalties, and must therefore be assumed to have been compensated by the possession and beneficial ownership of the property.

As to a tender being necessary before demanding a reconveyance, whatever is involved in this, as was before observed, is a matter to be adjusted in the final decree. Sloane v. Shiffer, 156 Pa. 59, 27 Atl. 67; Thackrah v. Haas, 119 U. S. 499, 7 Sup. Ct. 311, 30 L. Ed. 486; Billings v. Aspen Mining Co., 51 Fed. 338, 2 C. C. A. 252. The plaintiff is simply called upon to reimburse the defendants as a condition to a reconveyance, not in advance of it, which, in the unsettled state of the accounts between the parties, is all that could be expected.

The findings of the master which are not in accordance with these views must be set aside, and the corresponding exceptions, without further specification, sustained. The rest, including all the

exceptions of the plaintiff, are dismissed. The account between the parties, which is to be adjusted as of the date of filing the bill, is thereupon stated as follows:

The defendants are chargeable with:

1. Royalties on ore mined and shipped from the Lancaster Farm, due and owing at the time of bringing suit:

| | | | |
|---|---|---|---|
| (a) For the year 1898, 703 1335/2240 tons, at $1 a ton | $703 60 | | |
| Less amount paid January 5, 1899 | 555 00 | | |
| | $148 60 | | |
| (This includes the $14.40 which was made the basis of a demand for a reconveyance.) | | | |
| Add interest from January 5, 1899, to February 26, 1900 | 10 16 | | |
| | $158 76 | | |
| (b) Mined in 1899, up to April 26, 28 1580/2240 tons, at $1 a ton | 28 70 | $ 187 46 | |
| 2. Estimated Royalties on coal which should have been mined for the ten months from April 26, 1899, to February 26, 1900, allowed as damages | | 530 00 | |
| 3. Money left as loan in defendants' hands, with interest at 5 per cent. per annum from July 1, 1899, to February 26, 1900 | | 2,065 27 | |
| | | $2,782 73 | |

The defendants are entitled, on the other hand, to the following credits:

By cost of Fulton Farm, $3,500, with interest, made up as follows:

| | | | |
|---|---|---|---|
| (a) Note for cash loaned to plaintiff, canceled | $1,100 00 | | |
| Interest from October 3, 1891, to February 26, 1900 | 554 22 | $1,654 22 | |
| (b) December 31, 1892, paid James Fulton mortgage | $1,216 00 | | |
| Interest to February 26, 1900 | 522 07 | 1,738 07 | |
| (c) November 29, 1899, paid Mrs. Martha Sharp, legacy charged on farm | $ 705 65 | | |
| Interest to February 26, 1900 | 10 25 | 715 90 | |
| (d) October 3, 1891, paid Howell note | $ 500 00 | | |
| Interest to February 26, 1900 | 252 00 | 752 00 | |
| | | $4,860 19 | |
| Deduct debits shown above | | 2,782 73 | |
| Balance due from plaintiff at time of filing bill | | $2,077 46 | |

Upon the balance so found against the plaintiff he is entitled to have credited the royalties from the Fulton Farm, which have been received by the defendants since the bill was filed. A reconveyance, as it is now determined, was due him at that time, and from thence on the returns from the property were of right his. These are only partially shown by the proofs, but must be definitely known and ought to be easily established. If they can be agreed upon, the amount can be embodied in the decree to be drawn, without sending the case back to the master; or, if not, it will have to be referred to him to ascertain them. They are too important to the plaintiff not

to permit him to supply the omission, and the defendants are also interested in not having the subject left open for further litigation.

Let the case stand over for the proofs suggested, on the coming in of which, by agreement or otherwise, a decree may be drawn by counsel, in favor of the plaintiff, in accordance with the views expressed in this opinion, with costs.