REYNOLDS et al. v. GENERAL ELECTRIC CO. GENERAL ELECTRIC CO. v. REYNOLDS et al. REVENUE TUNNEL MINES CO. v. GENERAL ELECTRIC CO. GENERAL ELECTRIC CO. v. REVENUE TUNNEL MINES CO.

(Circuit Court of Appeals, Eighth Circuit. November 15, 1905.)

Nos. 2,261—2,264.

1. SALES—CONTRACTS—CONSTRUCTION—CAPACITY—WARRANTY OF EFFICIENCY.
   A contract by a dealer to furnish to a purchaser a definite pump of known manufacture, "having a capacity of 300 gallons per minute against a head of 350 feet," which has been selected by the purchaser and is to be built by the manufacturer, is not a warranty of the size, design, construction, materials, efficiency, and endurance of the pump, but is, like its name, descriptive, and limited in effect to a warranty of the quality of size.

2. SAME—IMPLIED WARRANTY OF FITNESS—ARTICLE OF KNOWN MANUFACTURE.
   Where a purchaser buys of a dealer a definite machine or article of a described manufacture, which has been or is to be made by a builder who is not the vendor, and the vendee knows this fact, there is no implied warranty by the dealer against latent defects, or that the machine or article will be suitable for the purposes for which such articles are commonly used, because the purchaser has the same knowledge and means of knowledge on these subjects as the seller.

3. SAME—IMPLIED WARRANTY OF QUALITIES—EXCLUSION.
   An express warranty of one of the qualities of a machine or article excludes implied warranties of other qualities of the article of a similar nature.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Colorado.

The General Electric Company, a corporation, brought two actions in the Circuit Court to enforce its claim for a balance of account of $10,000, which was due to it for machinery which it had sold and delivered to the Revenue Tunnel Mines Company, another corporation. One of these actions was against the mines company for the balance of the account. The other was against Albert E. Reynolds and others, who were directors of the mines company, and was founded upon the indebtedness of the latter company, and upon the fact that it had failed to file its annual report within 60 days after the 1st day of January in the years 1902 and 1903, and had thereby charged its directors with liability for its debts, under Sess. Laws Colo. 1901, p. 121, c. 52, § 11. The two actions were tried together. The same defenses were interposed in each. They were: (1) That the plaintiff in the year 1902 warranted a pump which it sold to the mines company to have a capacity of 300 gallons per minute against a head of 350 feet; and (2) that the plaintiff warranted this pump to be reasonably fit and proper for the use of pumping water in the shaft of a mine, and it was so defective that it was unsuitable for this purpose. These were the material facts established at the trial: The plaintiff was a manufacturer of electrical machinery, and it was a dealer in pumps, but it did not manufacture them. The mines company inquired of the plaintiff for the cost of an electric pump to force 300 gallons of water per minute to a height of 350 feet, with a direct current of 800 volts. The machinery requisite for this purpose consisted of a pump, an electric motor to drive it, and a starting rheostat. The plaintiff was the manufacturer of electric motors, but it was necessary to have the pump constructed by a builder of pumps. It wrote to the mines company that it assumed that it would require a standard stationary pump, and that it was taking the matter up with the pump builders.

A few days later it quoted prices on its motor and rheostat, (1) with a Knowles horizontal triplex 8x8 single acting power pump, (2) with a Knowles vertical triplex power pump, and (3) with a Worthington vertical triplex 8x2 power pump, and the mines company selected the Worthington pump. Thereupon the plaintiff agreed to furnish a Worthington pump "having a capacity of 300 gallons per minute against a head of 350 feet," and one of its motors with a starting rheostat to drive the pump. It promised to ship the motor to the works of the Worthington company, and to deliver the outfit, after testing it, free on board the cars at that place. No complaint was ever made of the motor or rheostat. The International Steam Pump Company owned the Worthington works and the Deane works. All the Worthington pumps were manufactured at the Deane works at that time, and the pump in question was made there from Worthington patterns. The dimensions and cubical capacity of the pump were sufficient to receive and discharge 300 gallons of water per minute against a head of 350 feet, and this task was accomplished by means of it for two or three days at a time. But, through some defect of materials, of workmanship, or of installment, its cylinders repeatedly leaked and broke, it became useless while attempts were being made to replace them and to repair it in other ways, and the mine became flooded before it was finally repaired by the use of steel cylinders so that it would perform the work the mines company desired of it. The latter company and the directors offered to prove, as damages sustained by the company from the alleged breach of the warranties, the increased cost of the power which the mines company had used during the repair of the pump, the salaries paid to its general and executive officers while the pump was disabled, the cost of removing the water from the shaft after it was flooded, and its loss from its interruption of its general mining operations while it was impossible to use the pump, but the court refused to allow them to do so, and they have sued out writs of error to review this and other rulings which present similar questions relative to the measure of damages. These writs present cases numbered 2,261 and 2,263.

The plaintiff requested the court to instruct the jury that the mines company was not entitled to maintain its counterclaim, and that they should return a verdict against it for $10,000 and interest. The court refused this request, instructed the jury that "express warranty means that the warranty is expressed in the contract, and implied warranty means that it is not expressed, but is inferred or implied by the law upon certain facts, and in either event the warranty is in this case that the machinery was made of reasonably suitable materials, that it could be operated for the usual lifetime of such machinery, that it would last whatever the usual life of such machinery would be—such a period of months or years, as the case might be"; and submitted the questions whether or not there was a breach of this covenant, and, if so, the amount of the damages. The plaintiff specifies this ruling as error, and cases numbered 2,262 and 2,264 are presented by its writs of error. There was a verdict and judgment in each case for $8,123.26.

Gerald Hughes (Charles J. Hughes, Jr., on the brief), for Revenue Tunnell Mines Co. and Albert E .Reynolds and others.

Henry F. May (John S. Macbeth and John F. Truesdell, on the brief), for General Electric Co.

Before SANBORN, Circuit Judge, and PHILIPS and CARLAND, District Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

If the plaintiff below was entitled to a directed verdict because it was guilty of no breach of any warranty, as its counsel assert, the alleged errors in the refusals of the court to receive evidence, and to submit instructions relative to the amount of damages of which the defendants complain, were not prejudicial, and will require no consid-

eration. The contention of the plaintiff will therefore first be considered. The only express warranty, which was in reality a condition and not a warranty, because the contract was executory, was that the pump should be a Worthington pump, and should have "a capacity of 300 gallons per minute against a head of 350 feet." The pump was a Worthington pump. It was made from Worthington patterns by the owner of the Worthington plant at the Deane works, where all Worthington pumps were then manufactured. It was of sufficient size, and it included ample space for 300 gallons per minute against a head of 350 feet, and that quantity was actually thrown through it for two or three days at a time before it was finally repaired. But either on account of latent defects in materials, in construction or in installation, parts of it gave way from time to time, so that it could not be used continuously until it was finally repaired by the use of steel cylinders. These facts did not constitute the breach of the express warranty alleged in the answer. That breach was that the pump never at any time had a capacity to exceed 120 gallons per minute against a head of 350 feet, and that after an attempt to increase its capacity above that amount some of the parts broke and disabled it until they were replaced.

It is now contended, however, that the warranty was that the pump "could be operated for the usual lifetime of such machinery, and that it would last whatever the usual lifetime of such machinery would be," and that, as it did not do so, the contract was broken. In other words, the claim is that the description of capacity was a warranty of performance, efficiency, and endurance. Counsel declare that they rely upon McGowan v. American Pressed Tan Bark Co., 121 U. S. 575, 602, 604, 7 Sup. Ct. 1315, 30 L. Ed. 1027, to support this position. In that case the defendants, who were manufacturers, made a written agreement to construct for the plaintiff a machine for the purpose of pressing bark. They described the various parts of the machine in the contract and expressly agreed (1) that the entire machine should be constructed "in a workmanlike manner and of first-class material"; (2) that it should "have a sufficient capacity to do the requisite work"; (3) that it could be "used up to fifteen hundred tons pressure"; and (4) that they guarantied "the whole." The Supreme Court held that by this agreement they guarantied that the machine could be used up to 1,500 tons pressure, not once only, but during the time such a machine would ordinarily wear under prudent management. Now, the question in the case at bar is whether the word "capacity," in the contract before us, was a mere description of the size, or of the room in the pump, made for the purpose of identifying it, as was the name "Worthington," or is a warranty of all its essential qualities, including size, space, design, strength, and endurance. The McGowan Case does not rule this question, either directly or inferentially, because the agreement in that case contains three express warranties that are not found in the case at bar: (1) That the machine should be constructed "in a workmanlike manner and of first-class material"; (2) that it could "be used up to 1,500 tons pressure"; and (3) that the manufacturers guarantied "the whole." If the word "size" were substituted for the word "capacity" in that contract, these three warranties would compel

the same construction which was given to it by the Supreme Court. The question at issue is therefore not determined by the McGowan Case.

The word "capacity" has many meanings. It means size, space, or compass. It means power or force. It means intellectual capability, both to receive and to perform. But its primary significance is passive. It is the ability to receive. Its secondary meaning is active. It is the ability to do or to resist. Century Dictionary, "Capacity." The seating capacity of a hall is its size, its ability to permit people to be seated within it. The capacity of a dynamo electric machine is its ability to produce power. In which sense did the parties to this contract use this word? The vendor was not the manufacturer, but was to become the purchaser from the manufacturer and the seller to the mines company of this pump, which the latter had selected, and all this the purchaser knew. While the pump was a machine that it was necessary for the manufacturer to build pursuant to the order of the plaintiff, it was still a definite and standard article of a character presumably known, from the name of its manufacturer, to the purchaser, who selected it from the three pumps that were offered to it, as well as to the dealer who procured it. A manufacturer knows, or ought to know, the design, materials, and workmanship of the machines he produces, while a trader in them, who has no connection with their manufacture, is chargeable with no such knowledge. For this reason the contracts of sale made by manufacturers are construed more strongly against them than are those which are made by dealers. Thus, in Cosgrove v. Bennett, 32 Minn. 371, 374, 20 N. W. 359, a manufacturer who undertook to construct a mill in first-class shape, which should have a capacity of 100 barrels per 24 hours, was held to have agreed that this mill would ordinarily turn out that amount of flour under proper management. The contract in that case, however, differs from the one before us, not only in the fact that the seller was the manufacturer, but also in the fact that he covenanted to construct the mill "in first-class shape."

A contract should have a natural and rational construction, if possible, one in accord with the course of action usually pursued by those of ordinary prudence under like circumstances, rather than one that is unnatural, unreasonable, and contrary to the customary course of action of men in situations similar to that of the contracting parties. It is not reasonable to suppose that a trader who is selling to a customer by description a machine of known manufacture, which the latter selects and the former purchases or orders for him, would guaranty that the article purchased would endure and do the work of similar machines as long as articles of that character ordinarily last. Such an obligation is out of proportion to the consideration which the dealer obtains from the sale, out of the ordinary course of business, and it should not be imposed upon and enforced against him unless it is clearly expressed in his contract, or may be fairly implied from it.

The contract in this case is evidenced by letters. It included a motor manufactured by the plaintiff, and a Worthington pump made by the owner of the Worthington works and patterns. After the plaintiff

had offered its motor and a choice of three standard pumps at specified prices, and the mines company had selected the Worthington pump, it made its final proposition, which, with an immaterial modification, was accepted. It was in these words: "In accordance with conversation we beg to make you the following quotation of electrically driven pump having a capacity of 300 gallons per minute against a head of 350 feet," followed by a specific description of the pump and motor. It does not appear from these words that the parties intended to use them to warrant all the essential qualities of the pump, its size, design, construction, materials, efficiency, and endurance; yet this is in effect the claim of counsel for the defendants. The interpretation that these words were used, like the word "Worthington," to describe or identify the pump by a description of a single quality of it, the size, or its receiving capability, is not inconsistent with any of the terms of the contract. The primary signification of the word "capacity" is passive, and in accord with this construction. In this contract it relates to a passive machine, one that does not drive, but is to be driven, by electricity. The passive meaning of the word is more appropriate to such an article than its active significance. The plaintiff was not a manufacturer of, but a dealer in, the pump made by another and selected by the vendee. Plain and simple terms which would occur to the mind of any business man were available to the parties to express with clearness and certainty a guaranty of the design, construction, materials, efficiency, or endurance of this pump, but the contracting parties did not use them. From this state of facts it is so difficult to logically deduce the conclusion that these parties intended to embody a guaranty of this nature in their contract by the use of the simple word "capacity," whose primary significance is limited to the quality of size, and does not include others, that we are unable to agree that such was the intention of the parties to the contract. Our conclusion is that a contract by a dealer to furnish to a purchaser a definite pump of a known manufacture, having a capacity of 300 gallons per minute against a head of 350 feet, which has been selected by the purchaser and is to be built by the manufacturer, is not a warranty of the efficiency, performance, or endurance of the machine, but a description of the pump, like the name it bears, and it is limited in its effect as a warranty to the quality of size. As this was the extent of the express warranty, the plaintiff was not guilty of any breach of it.

It is said that an implied warranty arose from the sale, to the effect that the pump should be fit and proper for the pumping of water in the shaft of a mine, and that this covenant was broken. If the pump was unfit to do the work which machines of that nature ordinarily perform, that condition arose from latent defects in the material of which it was constructed, or in the workmanship bestowed upon it, of which the plaintiff had no notice. The electric company secured and delivered the article of the known manufacture which the mines company had selected, and which was described in the contract. A manufacturer is charged by the law with notice of latent defects in the design, materials, and construction of the machines he makes which unfit them to perform the ordinary work of such articles, because he fur-

nishes the design, the materials, and the workmanship, and thus either causes or permits the defects. Out of this state of facts and an agreement of sale an implied warranty arises on the part of the manufacturer that the machines he makes are suitable for the general purposes for which such articles are commonly used. Goulds v. Brophy, 42 Minn. 109, 112, 43 N. W. 834, 6 L. R. A. 392. But where such a purchaser buys of a dealer a definite machine of known manufacture, which has been, or is to be, made by a builder who is not the vendor, and the vendee knows this fact, there is no implied warranty by the dealer, either against latent defects or that the machine or article will be suitable for the purposes for which such articles are commonly used, because the purchaser has the same knowledge and means of knowledge of these subjects as has the dealer. The vendee knows that they both rely on the character and reputation of the manufacturer. Bragg v. Morrill, 49 Vt. 45, 47, 24 Am. Rep. 102; American Forcite Powder Mfg. Co. v. Brady, 4 App. Div. 95, 97, 38 N. Y. Supp. 545; Gardner v. Winter (Ky.) 78 S. W. 143, 63 L. R. A. 647, 649.

Again, the parties to this sale put their contract in writing, and embodied in their writing an express warranty of one of the qualities of the pump essential to its fitness for the general uses for which such pumps are designed. Where parties have deliberately put their engagements in writing in such terms as import plain legal obligations, it is conclusively presumed that the whole engagement of the parties and the manner and extent of their undertaking were embodied in the writing. McKinley v. Williams, 74 Fed. 94, 101, 20 C. C. A. 312, 319. The contract of these parties was of this character. Its subject was the pump that was sold, and the expressed warranty of one of its qualities, of its size, which is contained in the description, raises the conclusive implication that other qualities requisite to its fitness for the general use of such pumps were not warranted. An express warranty of one of the qualities of an article excludes an implied warranty of other qualities of a similar nature. The exaction or acceptance by the purchaser of personal property of a warranty of one quality raises a conclusive presumption that he did not desire, or could not secure, or the parties agreed that he should not have, the warranty of others of the same character. Benjamin on Sales (7th Am. Ed.) 672; Carleton v. Lombard, Ayres & Co., 72 Hun, 254, 260, 25 N. Y. Supp. 570; Jackson v. Langston, 61 Ga. 392; Baldwin v. Van Deusen, 37 N. Y. 487, 489; Deming v. Foster, 42 N. H. 165, 175; De Witt v. Berry, 134 U. S. 306, 313, 10 Sup. Ct. 536, 33 L. Ed. 896; Seitz v. Brewers', etc., Machine Co., 141 U. S. 510, 517, 12 Sup. Ct. 46, 35 L. Ed. 837; Buckstaff v. Russell & Co., 79 Fed. 611, 615, 25 C. C. A. 129, 133; International Pavement Co. v. Smith, etc., Machine Co., 17 Mo. App. 264, 269; Chandler v. Thompson (C. C.) 30 Fed. 38, 46; J. I. Case Plow Works v. Niles & Scott Co., 90 Wis. 590, 604, 63 N. W. 1013; McGraw v. Fletcher, 35 Mich. 104, 106; Mullain v. Thomas, 43 Conn. 252, 254. There was no implied warranty of the fitness of the pump to do the work for which pumps of its nature are designed, and there was no breach of the express warranty contained in the contract.

The judgments below must accordingly be reversed, and the cases must be remanded to the court below, with instructions to grant new trials. The writs of error in cases numbered 2,261 and 2,263 challenge no rulings that are prejudicial to the defendants in the cases below, and they must be dismissed at their costs. It is so ordered.