## DORSEY v. WATKINS.

### (Circuit Court, W. D. Missouri. February 18, 1907.)

### No. 3,015.

**1. SALES—RESCISSION BY BUYER—BREACH OF WARRANTY.**

Where the purchaser of a herd of dairy cows was a competent judge of such property, and had full opportunity and ample time for inspection before the purchase, no warranty of the fitness of the animals for dairy purposes can be implied; and where a written contract of sale was made, which contained no express warranty, the rule of caveat emptor applies, and the purchaser is not entitled to rescind the contract on account of the diseased condition of some of the cows, in the absence of fraud on the part of the seller.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, §§ 746, 767.]

**2. SAME.**

The rule sometimes applied that a party to a sale may be entitled to a rescission where he was misled to his injury by representations made by

the other party which proved to be untrue, although they were made in good faith, on the ground that it would be inequitable to permit him to retain the benefit of a contract so induced, cannot be applied to a sale within the rule of caveat emptor, as in case of a sale of live stock where there was no warranty, either express or implied, and where the purchaser had full opportunity for inspection.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Sales, § 84.]

3. CANCELLATION OF INSTRUMENTS—INVALIDITY.

Complainant brought suit for the rescission and cancellation of a contract by which he purchased from defendant a herd of cows to be used for dairy purposes, on the ground that they were infected with tuberculosis and were unfit for the purpose for which they were bought. There was no warranty, and the evidence did not establish any fraud or misrepresentation on the part of defendant, or that he had any knowledge of such infection, if it existed, and in fact the sale was made at the instance of complainant, who was an expert in dairying and had full opportunity to inspect the herd. It also appeared, from publications of the Department of Agriculture introduced in evidence, that such infection exists to a greater or less extent throughout the country, and the herd in question was not shown to have been seriously affected. Complainant abandoned the property and left it in defendant's hands without completing the payment therefor. *Held*, that under such facts he was not entitled to relief in equity.

James C. Williams and Wash Adams, for complainant.
James M. Sandusky and Frank H. Trimble, for defendant.

POLLOCK, District Judge. · By the bill of complaint presented in this case the cancellation of certain written instruments and the return of money paid is sought by complainant on the ground of fraudulent misrepresentations, charged to have been made by the defendant to complainant to induce the making of such writings and the payment of the money. The case has been fully presented in oral argument, and stands submitted for decision on abstract of the testimony and printed briefs filed by solicitors for the respective parties. In most things the testimony is conflicting; but the facts material to a decision of the controversy, as I find them from a reading of the testimony contained in the abstracts, briefly stated, are as follows:

The defendant is a farmer owning a farm of about 437 acres near Lawson, Clay county, this state. About the year 1898 he entered the dairy business in a small way, and increased that business until in the month of January, 1905, he had a herd of about 100 Jersey cows, about one half of which he had raised on his farm. The remaining half he had acquired by purchase from others. At this time he had an established business. The products of his dairy were well and favorably known among dealers in Kansas City and other places, and commanded prices above the usual market price of such products on account of their superior quality and excellence. The complainant is a young man 26 years of age, experienced for a man of his age in the dairy business, having attended the agricultural school at the State University of his native state, Illinois, for three years, and also having attended an agricultural school located at Ames, Iowa, for a period of a year. He also had been in charge of a dairy farm near the city of St. Louis for some time prior to the

date of the transaction in question. Immediately prior to the date of this transaction he made a trip through the Northwest seeking a location for the purpose of engaging in the dairy business. Being at Excelsior Springs January 6, 1905, he learned in some manner of defendant's place and herd of dairy cows; called defendant over the phone and arranged to go out and see his herd, which he did, arriving there after dark on that day; remained there overnight, discussing with defendant his business, inquiring where he marketed his butter, the price obtained, the condition of his dairy herd, and other matters; and at the time asked defendant if his herd of cows had ever been tested for tuberculosis, to which defendant responded it had not been so tested. On the following morning he spent about an hour looking through the herd of cows, inspecting dairy rooms and the manner in which the business was conducted; then left, going to Kansas City, where he inquired of defendant's customers as to the truth of the statements made to him by the defendant, and of others as to the reputation of the dairy and its products. It does not appear from the proofs on this first visit that complainant offered to buy, or the defendant proposed to sell him, the herd of cows. From the conversation, however, plaintiff did learn he could buy all or part of the cows if the price was satisfactory to the defendant. When complainant left, he said he was going to Liberty, Mo., to look over the situation there, and said nothing about returning to defendant's place. However, on Tuesday, the 10th day of January thereafter, he reappeared at defendant's place and remained there for some two or three weeks thereafter. At the time complainant returned he did it with the purpose in his mind of purchasing the business, and spent the time there looking over the business to find out how it was conducted, the amount of butter made and shipped, the individual records of the several cows in the herd, which was kept, and in learning what he could about the property and business; and finally, on the 31st day of January thereafter, the following agreement was entered into between the parties for the purchase and sale of the herd of dairy cows and other personal property:

"This contract, made and entered into this 31st day of January, 1905, by and between A. J. Watkins, of Clay county, Missouri, party of the first part, and Clarence B. Dorsey, of Clay county, Missouri, party of the second part, witnesseth: That the said party of the first part, for and in consideration of the sum of five thousand five hundred dollars ($5,500), hath this day bargained, sold, transferred and conveyed to the said party of the second part the following personal property, to wit: One refrigerator, nine cans, three boilers; one cauldron, one seal and wire for seal, all his Reid butter boxes and trays, one pair of platform scales, one pair of butter scales, one butter mould and die; one churn and worker, one separator, one tester and glass, one can of butter coloring and tablets, one lot of test bottles, one sack of salt, ten thousand butter wrappers, two racks and papers, two stoves, one lot of stone jars, all his knock-down butter boxes, one Deering mower, one mare named 'Ruby,' four sets of harness, two sixteen-inch plows, two listers, one planter and disc, two two-row cultivators, one harrow, two three-horse double trees, one Deering corn harvester, two wagons, one set of single harness, two saddles, one lot of tools, all the ice in two icehouses, eighty acres of fodder shredded, seven hundred and fifty bushels of corn, one lot of coal, seven sows, one male hog, twenty-four shoats and pigs, heifer calves, ninety-two heifers and cows, seven

steer calves and three bulls, one barrel of sal soda, and one Deere eight-roll shredder. All said property is located on the premises of the said party of the first part in section one, of township fifty-three, of range thirty, and the possession of all said property is this day delivered to the said party of the second part. Of the consideration named as the purchase price of said property, the sum of twenty-five hundred dollars ($2,500) is this day paid in cash, and the note of the said party of the second part is this day taken for the residue, to wit, the sum of three thousand dollars ($3.000), due twelve months from date, and secured by chattel mortgage upon a part of the personal property hereinbefore described.

"[Signed in duplicate]               A. J. Watkins,
"Clarence B. Dorsey."

On the same day, as a part of the same transaction, defendant leased to plaintiff about 320 acres of his farm for the period of one year, for the purpose of transacting the dairy business, at the annual rental of $1,400, payable as follows: $500 June 1st, $500 September 1st, and $400 November 1st, 1905. The lease also contains an option on complainant's part to lease the entire farm for an additional period of four years at an annual rental of $2,200. All the papers evidencing the transaction were prepared and executed in the law office of Judge Sandusky, attorney for defendant, at Liberty, Mo. The negotiations between the parties respecting the trade consumed the greater part of the day. During these negotiations the question arose as to the insertion in the lease of a clause giving defendant the right of re-entry under his lease in case of non-payment of rent reserved for the period of 60 days after the same should become due. To the insertion of this clause in the lease complainant objected, on the ground that something might arise making its prompt payment impossible. The cattle might be diseased, the hogs might die, crops might fail, or he might get sick, and be unable to meet the payments of rent promptly, and cause a sacrifice of his property. In reply to this statement defendant remarked the cattle were all right so far as he knew, but that he did not warrant the stock, or any live stock he sold; that the crops would be fed to the cattle, leaving him no security for his rent. About this time Judge Sandusky, the scrivener engaged in drawing the papers, said "there was no warranty," and defendant said, "No, sir;" complainant saying nothing more in this respect. The papers, including the contract, a promissory note of $3,000 evidencing the deferred payment, a mortgage on a part of the personal property to secure payment of the same, the lease, and the promissory notes evidencing the rent to be paid in accordance with the terms of the lease, were executed. Complainant paid to the defendant the $2,500 cash on the purchase price, as specified in the contract, and complainant assumed possession of the business and remained in the home of defendant until some time in the month of May thereafter.

For some time after his purchase of the business, as appears from the proofs, complainant seems to have been satisfied with his trade, and so late as the month of May it appears he contemplated a continuance of the business and the carrying out of his contracts. While there is proof found in the record that some of the cows, shortly after complainant assumed control of the business, and especially cow

No. 17, was found to be coughing, yet the general appearance of the herd seems to have been good, considering the time of the year. About the last of May complainant began to exhibit dissatisfaction with his trade. His account became overdrawn at the bank, and his business affairs evidently did not prosper as he had anticipated. About this time it 'appears he commenced consulting with a firm of veterinarians about the herd of cows. Representatives of such firm came to the farm quietly, and without any notification to defendant tested the herd for tuberculosis. One of the cows which had become lame or diseased was quietly killed. During all this time he made no complaint to defendant about the condition of the herd, but, when requested by the defendant for payment of rent due June 1st, expressed his intention of paying the same and the manner in which he expected to raise the money to make such payment. Finally, in the month of June, he sold off the butter which had accumulated at prices less than the usual price paid for the same. He also sold some of the hogs purchased from defendant, had the cattle tested for tuberculosis, and on June 16th or 17th went to defendant, informed him the cattle were diseased, and among other things said, "I will quit if you do not make settlement with me." He also procured the state veterinarian to quarantine the cattle, informed his employés he would pay them no longer, and abandoned his business and contract with defendant. Thereafter defendant took possession of the premises under his lease and has since cared for the cattle.

A controversy arose between the state veterinarian and defendant, growing out of the fact that the state official accused the defendant of having injected tuberculin into the cattle, thus reducing their temperature at the time designated for a test of the cattle made for the purpose of ascertaining whether they, or any of them, had tuberculosis, and for the purpose of releasing from the order of quarantine all cattle found not so diseased. Owing to this disagreement the cattle at the time this case was heard remained in quarantine in the hands of the defendant unproductive, because neither the cattle nor the product from them could be disposed of. The proofs further show, in the year 1901, defendant had sold out of his herd some 25 or 30 cows, and that none of them, so far as could be ascertained, has ever been infected with tuberculosis. During all the years defendant had managed the business he had lost in all only 11 head of cows which had died from any cause; and none of them, in so far as could be ascertained, having died from tuberculosis.

With the proofs in this case there has been submitted certain public documents from the pen of the chief of the Bureau of Animal Industry, a branch of the governmental Department of Agriculture, and others, from which it is learned the disease known as "bovine tuberculosis" is, and for many years has been, prevalent in all parts of the civilized world. D. E. Salmon, chief of the Bureau, says:

"The statistics concerning tuberculosis show that it is a disease prevalent in all civilized countries. In some countries, such as the northern part of Norway and Sweden, on the steppes of eastern Europe and Russia, in Sicily and Iceland, and in Algiers, it is said to be quite rare. The returns from testing British cattle with tuberculin supplied by the Royal Veterinary College, as

stated in March, 1900, shows that, among 15,392 animals tested, 4,105, or 26 per cent., reacted."

From tests made of herds of cattle in many of the states it is shown from the same authority the disease is probably prevalent to a greater or lesser extent in all herds of cattle, and more especially is this true of highly bred herds; the infected running from 3 $^{5}/_{10}$ to 26 per cent. Taking such statistics as the guide, it is probably true the herd in question may have been to some extent infected when its purchase was made from defendant by complainant; but the proofs relating to this particular herd do not show the prevalence of such disease prior to complainant's purchase, and wholly fail to show, if it was so infected, defendant had any notice or knowledge of such disease prior to his trade with complainant.

This suit is brought by the complainant to cancel the instruments of writing executed in consummation of the trade and to recover the cash payment made. In the light of the facts stated, what are the rights of the contending parties? The contract of sale and purchase, as has been seen, contains no covenant warranting the soundness of the herd. The fact that the question of warranty as to the soundness was mentioned during the negotiations, and that the contract is silent in this respect, is conclusive proof none was intended. As said by Judge Sanborn in McKinley v. Williams, 74 Fed. 101, 20 C. C. A. 312:

"Where the parties have deliberately put their engagements into writing in such terms as to import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the manner and extent of their undertaking was reduced to writing." Thompson v. Libby, 34 Minn. 374, 26 N. W. 1: Barnes v. Railway Co., 4 C. C. A. 199, 54 Fed. 87; McMurphy v. Walker, 20 Minn. 382 (Gil. 334); Harmon v. Harmon (C. C.) 51 Fed. 113; Wilson v. Cattle Ranch Co., 73 Fed. 994, 20 C. C. A. 241.

As complainant, a competent judge of such property, with full opportunity and ample time afforded him, inspected the herd before his purchase, although the purchase was made for a particular purpose, no warranty of fitness for such purpose is implied. Mechem on Sales, vol. 2, § 1311 et seq.; Reynolds v. General Electric Co., 141 Fed. 551, 73 C. C. A. 23; Howard v. Emerson, 110 Mass. 320, 14 Am. Rep. 608; Hanson v. Hartse, 70 Minn. 282, 73 N. W. 163, 68 Am. St. Rep. 527; McQuaid v. Ross and another, 85 Wis. 492, 55 N. W. 705, 22 L. R. A. 187, 39 Am. St. Rep. 864; Goad v. Johnson, 6 Heisk. (Tenn.) 340; Scott v. Renick, 1 B. Mon. (Ky.) 63, 35 Am. Dec. 177.

There being here neither an express nor implied warranty upon which complainant may rely, the rule of "caveat emptor" applies. Therefore the defendant is not at fault, unless he knowingly misrepresented the facts for the purpose of inducing the purchase made by complainant, or knowingly represented that to be true which was not true, and which he did not know to be true. In other words, in the absence of fraud on the part of the defendant, the sale made must stand.

While the bill here presented charges all the essential elements of an action at law to recover damages for fraud and deceit, it is entirely clear complainant has failed to discharge the burden resting upon

him of producing proofs sufficient to support such charge; for it is not shown by the proofs that defendant either knew, 'or had any' reason for knowing or believing, the herd was infected with the disease of tuberculosis at the time of its purchase by complainant, and it is not shown defendant represented any fact to exist which is shown to be untrue and of which he had no knowledge. Defendant did not seek complainant out as a prospective purchaser, but the initiative in the transaction was taken by complainant. Hence, if it be true, as stated from scientific authority on the subject, that the disease is one of general prevalence, and hence, of necessity, the herd in question, from the very nature of things, must have been infected to a greater or less extent, yet complainant, by reason of his special education and knowledge of the subject, and his ample opportunity for an actual inspection of the herd before his purchase, in the absence of any warranty of soundness, express or implied, must be held to have accepted the risk of the appearance or development of a latent disease, such as tuberculosis is shown to be by the proofs. From the entire record I am convinced, even if it might be said, taking scientific knowledge, and not the proofs as to this particular herd, as the basis, that the herd was infected to any extent with the disease of tuberculosis at the time of the trade, the defendant had neither knowledge nor means of knowledge of such fact, and he did not knowingly make a misrepresentation as to the soundness of the herd purchased.

However, it is urged by solicitors for complainant that, although the proofs may fail to show defendant knowingly made any false representations as to the soundness of the herd purchased for the purpose of inducing the sale, yet, this being a suit for rescission of contract and cancellation of the writings made in consummation thereof, if the proofs show any such material statements were made by the defendant however innocently, and the herd was in fact infected with the disease of tuberculosis to such an extent as to render it unsuitable for the purpose for which it was sold by the defendant and purchased by complainant, then it would be inequitable to refuse the decree prayed; and many cases are cited in support of this contention. While, as has been seen, such is not the theory on which the bill presented was drawn, yet it is thought this fact alone would not warrant the refusal of the decree as prayed, if the proofs are sufficient, and the rule contended for is applicable to the circumstances of this case. The rule contended for was applied in Billings v. Aspen Mining & Smelting Co., 51 Fed. 346, 2 C. C. A. 252; Turner v. Ward, 154 U. S. 618, 14 Sup. Ct. 1179, 23 L. Ed. 391; Wheeler v. Smith et al., 9 How. 55, 13 L. Ed. 44; Smith v. Richards, 13 Pet. 26, 10 L. Ed. 42; McFerran v. Taylor, 3 Cranch, 279, 2 L. Ed. 436; Doggett v. Emerson et al., 3 Story, 700, Fed. Cas. No. 3,960; and many other cases.

In Billings v. Aspen Mining & Smelting Co., supra, it is said:

"It is, under the circumstances in this case, immaterial whether Devereux knew the falsity of these statements or not. Even though he then believed them to be true, yet as it now appears beyond doubt that these statements were without foundation, and that the Wood heirs held the title to one-third of the property, equity will not permit the grantee in the deed to enjoy the benefits thereof, when it appears that the grantor was induced through a total misapprehension of her right and title, which misapprehension was caused

by the representations of the grantee or his agents, even though such untrue representations were at the time made in good faith. In such case the inequity would exist, not in the making the representations originally, but in claiming the benefit thereof after discovery that the other party has been misled, to her injury, by relying on the statements made for the purpose of inducing action on her part, which now appear to have been wholly untrue."

Conceding, for the purpose of the argument, defendant in this case did make statements as to the herd being free of disease, as contended by complainant, and as positively denied by the defendant, yet it is apparent at a glance that the rule contended for has no application here. The rule stated is inconsistent with and does not apply to those transactions where the doctrine of "caveat emptor" is the guide. The sale here made was of live stock, inspected by the buyer before his purchase. As has been seen, there was no warranty of fitness for the purpose for which the purchase was made, either express or implied. The disease which it is now contended infected the cows at the time was in its nature latent and of which the seller had no actual knowledge. The ability of the buyer to determine the existence of this latent disease by inspection, on account of his peculiar training, was equal to, if not greater than, that of the seller. In other words, complainant knew, in the making of the trade in question, under the circumstances in which it was made, the law of "caveat emptor" compelled him to be his own judge of the fitness of the herd for the purpose of the business for which they were intended; that he could not rely on the superior judgment of the seller as to the existence or nonexistence of a latent defect, the actual existence of which was unknown to both. Therefore I am of the opinion, under the facts and circumstances in proof in this case, the rule contended for by the complainant is not applicable, even though it should be conceded the evidence shows the infection of the herd at the time purchased, which in my opinion it does not, except as it may be drawn from a scientific knowledge of the disease as applied to subsequent events.

Again, it may be said the conduct of the complainant is so lacking in that fairness of dealing with the defendant in regard to the property in question, with respect to the disease with which he claims the herd was infected, the manner in which he sought to have tests made for the purpose of ascertaining if it was so infected, the manner of disposing of property on hand covered by the mortgage of defendant, and in abandoning his trade, that his supposed equities do not appeal strongly to the conscience of a chancellor.

For all these reasons, I am of the opinion that the complainant's case as made out from the proofs is without equity, and the prayer of his bill must be denied. It is so ordered.