**BIRD & SON, Inc., v. GUARANTEE CONST. CO. (two cases).**

(Circuit Court of Appeals, First Circuit. February 5, 1924.)

Nos. 1634, 1635.

1. **Sales ⊜⇒55—Law as to place of making and of performance governs.**

Where a contract for the sale and installation of machinery was made in Massachusetts and was to be performed there, the law of Massachusetts governs the rights of the parties.

2. **Evidence ⊜⇒417(12)—Correspondence and conversation considered, where contract not intended to cover entire agreement.**

Where the contract of sale of a conveyor system was not of such a formal and dignified nature as to indicate that it covered the entire agreement, all the correspondence and conversation between the parties relating to the contract may be considered.

3. **Sales ⊜⇒267—Express warranty held not to prevent implied warranty.**

An express warranty in a contract of sale of a conveyor system, referring to matters of design, workmanship, material, and handling capacities, *held*, under G. L. Mass. c. 106, § 17 (6), not to prevent an implied warranty as to functional efficiency.

4. **Sales ⊜⇒270—Buyer's employment of consulting engineer held not to relieve seller of liability on implied warranty as to functional efficiency.**

Employment of consulting engineer by buyer of a pneumatic conveyor system *held* not to relieve seller from responsibility on implied warranty as to the functional efficiency of the pneumatic system.

5. **Sales ⊜⇒273(2)—That buyer did not give notice to manufacturer that conveyor system must not change goods conveyed held not to prevent liability.**

Where a pneumatic slate conveyor system, after being installed, to the surprise of both parties proved to be practically a complete failure, the fact that the buyer did not notify manufacturer that it wanted the slate transported without substantial change, and that, if substantially changed, it would not be suitable for the use intended, *held* not to relieve the seller of liability on implied warranty, under G. L. Mass. c. 106, § 17 (1, 6), in view of manufacturer's advertisement that such systems involved a considerable degree of expert knowledge, and request that buyer rely on manufacturer's expert knowledge.

Johnson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts; John A. Peters, Judge.

Actions by the Guarantee Construction Company against Bird & Son, Inc., and by Bird & Son,, Inc., against the Guarantee Construction Company. Judgment for the Guarantee Construction Company in each case, and Bird & Son, Inc., brings error under a consolidated bill of exceptions. Judgment in each case reversed and remanded.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John G. Palfrey, of Boston, Mass. (Henry E. Warner and Warner, Stackpole & Bradlee, all of Boston, Mass., on the brief), for plaintiff in error.

J. N. Welch, of Boston, Mass. (Richard W. Hale and Hale & Dorr, all of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The first of the above actions was brought by the Guarantee Construction Company against Bird & Son, Inc., to recover $12,432.19, the balance of the contract price of pneumatic apparatus for unloading and conveying ground slate at the factory of Bird & Son, Inc.

The second was brought by. Bird & Son, Inc., against the Guarantee Construction Company, to recover $45,159.80, part payment under the same contract. The cases were tried together to a jury, and a verdict for the Construction Company was returned in each case. They were brought here upon writs of error under a consolidated bill of exceptions. The assignments of error relate to the rulings made by the court and to portions of the charge.

Bird & Son, Inc., is a Massachusetts corporation engaged in the manufacture of asphalt-shingle roofing, with a factory at Norwood, Mass. The shingles are made from a certain kind of paper, which is put through a process for saturating it with asphaltum, and then covered on one side with ground slate, which adheres to the asphaltum surface coating of the paper. Ground slate, crushed and screened at the quarries into the required size, is obtained in carload lots. It had been the practice of Bird & Son, Inc., to unload this ground slate by shoveling it from the freight cars into wheelbarrows, from which it was dumped into bins, and then shoveled from them by hand into trucks as desired, and wheeled to a receptacle, which distributed it upon the surface of the prepared paper as it passed beneath.

As early as April, 1919, Bird & Son, Inc., received from the Construction Company an advertising circular, in which it was stated, inter alia:

"The Guarantee Construction Company is an organization of broadly experienced contracting engineers, specializing in the following lines:

"Complete design, construction, and equipment of * * * labor-saving equipment for handling coal, ashes, and other materials in bulk.

"Work of this nature involves a considerable degree of expert knowledge. * * * Our function is to show the economies possible and install the particular sort of equipment which will best accomplish the greatest saving."

On July 24, 1919, Bird & Son, Inc., sent the Construction Company samples of the "ground slate and soapstone such as we use in the manufacture of our roofing paper," adding:

"We would be pleased to have you look over these samples and advise us whether they could be handled by your pneumatic system of conveying."

On August 8, 1919, the Construction Company wrote, referring to a conversation on the day before:

"The pneumatic system will handle these materials very nicely."

And again, on August 19, 1919:

"The surfacing material, samples of which you sent us, is a rather specialized material, and we regret that we cannot refer you to any installations identical with this. However, this material presents a far simpler problem than most of the materials for which we frequently install conveying apparatus. Any proposition that we make to you will be covered by a positive and explicit guaranty of successful operation; also by bond, if you wish."

There was also evidence that a representative of the Construction Company visited the plant of Bird & Son, Inc., and was shown the process of applying the slate to the processed paper, including the arrangement for sucking superfluous dust from the ground slate just before it reached the paper, and that the importance of removing dust from the slate was then explained to the Construction Company's representative.

Several months were taken up in correspondence, in negotiations, in preparing designs, and in making experiments. Bird & Son, Inc., employed the office of Charles T. Main, consulting engineers, to prepare plans and specifications for a system of unloading and storing far more elaborate than were contemplated in the early days of the negotiations.

On December 4, 1919, Bird & Son, Inc., sent a written order "to furnish and install ground slate conveyor and storage bin system as per C. T. Main's specifications." This order covered material and construction to cost $49,080. After further negotiations and correspondence, a supplementary order was sent by Bird & Son, Inc., on January 23, 1920, for "extra material as covered by C. T. Main's letter to us of January 5, 1920, price $8,051.00."

The specifications as finally agreed upon embodied the pneumatic method of conveyance throughout. They provided for two stages of conveyance: First, by suction from freight cars to storage bins; and, second, by pressure from storage bins to service bins located over the paper machine. Pressure or suction was to be created by blowers, which were located near the storage bins and near the railroad tracks. There were to be exhausts by the blowers, and also at the service bin, at which dust had an opportunity to escape to the open air.

The record discloses that after the equipment was installed, in the spring of 1921, several attempts were made by the Construction Company to revise the system so as to get rid of the dust that was formed; but the changes made did not cause the system to handle the ground slate at the rate specified in the contract without the creation of considerable dust and consequent change in the particles of slate. It was found impossible to suck this ground slate into the separator above the storage bins, and then to blow it from the storage tanks to the service bin, at the high rate of speed required by the specifications, without causing a great deal of dust and what was termed a "degradation" of the materials.

It appears from the record that about 10 per cent. of the material was ground into dust and lost in the process of handling, and that the particles of ground slate were reduced in size or so worn and covered with dust that, when they fell upon the specially prepared paper, they would not satisfactorily adhere to it.

After repeated tests and prolonged negotiation, Bird & Son, Inc., rejected the apparatus as a failure.

Shortly stated, the pneumatic system thus installed, instead of reducing the amount of dust produced under the old method of handling, enormously increased it, and it also so ground or rounded the rest of the slate as to make it unfit for use in the business of Bird & Son, Inc. This result, practically an entire failure of the new system, was, as the court in effect told the jury, a surprise to both parties; for it is obvious that the system would not have been installed, if either the manufacturer or the buyer had supposed that it would be what it proved to be, a complete failure.

The gist of the case, then, is whether the jury should have been instructed, substantially as Bird & Son, Inc., requested, that there was, or might be found to be, an implied warranty by the Construction Company that its conveyor system would convey this slate material, substantially unchanged, or at any rate not so changed as to be unfit for the buyer's use.

Bird & Son, Inc., requested the following ruling:

"If the apparatus ordered by Bird & Son, Inc., was intended to handle and convey material, or if there was any guaranty or warranty, express or implied, that it would handle or convey material, the meaning of handling or conveying the material is handling or conveying the same without substantially changing its fitness and suitability for the purposes for which it was intended, and if the apparatus in the process of handling or conveying substantially changed the character of the material, by grinding a substantial part of it or an appreciable part of it into dust or particles too fine for use as roofing material, or if it ground a substantial part into dust and discharged the dust into the air, so that a substantial part of the material did not arrive at its destination, then the apparatus did not handle or convey the material in accordance with the true meaning of those words."

The court declined to give this instruction, but gave the following:

"I am going to instruct you that the law implies a further obligation upon the Guarantee Construction Company, a further undertaking or guaranty, or perhaps warranty would be a good word, that the apparatus it was to build would, when completed, be suitable and fit to accomplish the purpose for which it was intended, so far as that purpose was known, or should have been known to the builder. But an equal obligation rests on the buyer. I have given you now the obligation that I think the law implies on the builder, that the apparatus should be fit and suitable for the purpose for which it was intended, so far as that purpose was known or should have been known to the builder; but an equal obligation rests on the buyer, Bird & Co., or its agents to advice the builder of any purpose for which the machine is to be used, or which it is desired to accomplish, that is not disclosed in the contract or obvious to an intelligent builder of said machinery."

"In that particular, if the buyer expected slate to be transferred unchanged, in my opinion he should have said so, or specified in the specifications, or imparted the information somehow to the builder, in order to get the benefit of this implied warranty. You see, unless the builder knows, or has good reason to know, or is put upon notice of some purpose, or a special purpose, for which this material is to be used, he cannot fairly and decently be held under any implied warranty; and when I have advised you, as a matter of law, that the implied obligation added by law to the express obligation that the parties have undertaken, I couple it especially with that idea, that no person can get the benefits of that implied guaranty resting upon the builder unless he himself has performed his duty, and advised the builder of any special purpose for which he desires the machinery to be used."

"I think you understand my theory of the law applicable to this matter of degradation. To sum it up, it is like this: The Construction Company did not guarantee against any degradation of material, unless they were advised, or knew, or should have known, that the transfer of the material without degradation was one of the purposes of the installation. That is for you to find out and determine whether they knew, or should have known."

The refusal to give the instruction requested and the giving of the above are the first and second assignments of error. By change, the court meant substantial change, as is shown by the following quotation from a later part of his charge:

"When I say 'without change,' I mean without substantial change, because I take it anybody would know that to put slate, partly ground, or ground, ground slate, they call it, into a long apparatus like this, built of steel, with angles in it, traveling a long distance, turning corners, going into hoppers, out of hoppers into dust collectors, and out again, I take it anybody would know there would be some abrasion, some change of material. What would seem not to be known, or at least not to be mentioned by either party, was the large amount of change, the great change, that occurred in the material. That is frankly stated here by the counsel for the Construction Company, that if they had known—he says distinctly that if they had known that one of the purposes was to deliver the material unchanged, they would not have used this sort of system."

The other exceptions as to the instructions concerning an implied warranty are referred to by the Construction Company's learned counsel, correctly enough, as all "blood relations." They are sufficiently alike, so that we need not discuss them in detail. The first six assignments cover these exceptions.

[1] As the contract in the present case was made in Massachusetts and to be performed therein, the law of Massachusetts governs. G. L. Mass. c. 106, § 17, subds. 1, 6, are as follows:

"There is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose. * * *

"(6) An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

The same principle, now codified as above in the Uniform Sales Act, is laid down by the Supreme Court in Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 116, 3 Sup. Ct. 537, 543 (28 L. Ed. 86), as follows:

"If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer or maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use."

See, also, Nashua Iron & Steel Co. v. Brush, 91 Fed. 213, 33 C. C. A. 456.

The Construction Company seek to avoid the difficulties which they obviously find in the instructions given as to the nature and application of an implied warranty by contending that, as matter of law, the Con-

struction Company was subject to no implied warranty. They urge this on two grounds:

[2] (1) That the contract as finally made was, in its entirety, embodied in the two written proposals and acceptances above referred to; that, under the parol evidence rule, all the previous negotiations and correspondence were immaterial; that the court should have ordered the same verdicts that the jury returned. This contention is unsound. The court left this part of the case to the jury, under an instruction sufficiently shown by the following:

"The contract between the parties in this case was not a formal contract in writing, but is to be found in the correspondence and conversations between the parties, including the final specifications accepted by each party, the plans submitted and approved from time to time, with such other obligations in any field left open and not occupied by the parties as the law implies. Consequently, with the exception of the parts implied by law, where not touched upon by the parties, and which I shall give you later, it will be for you to determine what the contract was, with such assistance as I may be able to give you; and for this purpose you may take into consideration all correspondence and conversations that relate to the agreements between the parties, under such instructions as you will receive.

"It is not permissible, ordinarily, to vary or add to a formal written contract by proof of conversations, as you probably know, but the letters and other papers here are of not such a formal and dignified nature as to indicate that everything the parties had in mind was included; and for that reason testimony of their conversations has been put in, without objection, and may be considered in this case, when made prior to giving the orders, and when and where relating to the proposed agreement."

This was sufficiently favorable to the Construction Company.

[3] (2) The other ground is that there was an "express warranty, which excludes all possibility of implied warranty."

The express warranty relied upon is found in one of the Construction Company's proposals, and is as follows:

"We guarantee this installation as regards design, workmanship, and material to be first class, and in accordance with good engineering practice, and to have the handling capacities stated, without undue strain on any part, and will replace without charge any parts proving defective within a period of one year after completion of erection."

This contention also is unsound. This express warranty has to do with matters of "design, workmanship, and material * * * and the handling capacities stated"; not with the suitability of the pneumatic system for the use of Bird & Son, Inc.—that is, its functional efficiency. This case falls under the rule in the Uniform Sales Act. supra, as follows:

"(6) An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

And in Williston on Contracts, § 993:

"Though the goods which form the subject of the bargain may be so described or identified as to preclude any implication of a warranty of fitness for a particular purpose, nevertheless there may be, under the principles already considered, a warranty that the goods are merchantable, unless goods of the sort agreed upon necessarily cannot be. It must be, however, possible to sell unmerchantable goods, even if the seller is a dealer or manufacturer, and though the buyer either does not inspect the goods or his inspection in the nature of the case can reveal nothing because the defects are

latent. The ordinary way to do this is for the seller expressly to state that the buyer must take the goods as they are. Any words or conduct tending to show that this was the intention of the parties will prevent a warranty from being implied. The common illustration of this principle is where the seller expressly refuses to warrant. Such a refusal shows an intention that the buyer shall take the risk of the quality of the goods; and a statement by the seller that he has no personal knowledge of the article sold also precludes reliance by the buyer on the seller's judgment. In some cases it has been held that an express warranty in a contract to sell or sale necessarily excludes any implied warranty. If express warranties in a contract are in their nature inconsistent with the warranties which would have been implied had none been expressed, it would indeed be violating the intention of the parties to imply warranties, but the principle should extend no further. An express warranty is generally exacted for the protection of the buyer, not to limit the liability of the seller. The fact that a seller expressly warrants a machine to be made of the best steel ought not to exclude an implied warranty that the machine is properly manufactured and will do the work such machines are designed to do, if such warranties would otherwise be implied. Excellent authority supports this view. Though a contract is in writing and no warranty expressed, one may be implied; for the implied warranty is not based on a supposed agreement of the parties, but is an obligation imposed by law."

See Kansas City Bolt & Nut Co. v. Rodd, 220 Fed. 750, 755, 136 C. C. A. 356.

Such cases as Alderson v. General Electric Co., 210 Fed. 775, 781, 127 C. C. A. 325, De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536, 33 L. Ed. 896, and Reynolds v. General Electric Co., 141 Fed. 551, 73 C. C. A. 23, are not in point.

[4, 5] Equally unmeritorious is the contention that the employment by Bird & Son, Inc., of C. T. Main as an engineer, relieved it from the responsibility which might be found to arise out of an implied warranty as to the functional efficiency of the pneumatic system. It could not on this record be ruled that, as matter of law, Bird & Son, Inc., relied on the engineer they employed and did not rely on the Construction Company as possessing special skill and knowledge of pneumatic conveyors. It must not be overlooked that we are now dealing only with the exceptions of Bird & Son, Inc., on a record which is limited to "the substance of all the evidence material to these exceptions." Whether, at a new trial, the existence of an implied warranty will be found to be a question of law or of fact, we cannot determine. It is plain that there was at least evidence for the jury of the existence of an implied warranty. The problem we must now deal with arises out of the limitations imposed by the trial court's instructions as to the nature and extent and application of such implied warranty, whether arising as matter of law or as matter of fact. We turn now to those limitations, shown above.

At first blush, the instruction that the implied warranty was limited to what the seller "should have known" seems sound. But on analysis of the nature of an implied warranty, and when taken in connection with the other instructions (to the effect that it was for the buyer to see that the seller did know that the slate must be transferred substantially unchanged), it is wrong; for the law says that, under such circumstances as this record discloses, the seller "should have known" all that was *necessary* to be known in order to meet the buyer's needs.

The seller's *actual* knowledge is immaterial; its ignorance is no excuse. If it held itself forth as specially skilled in this field, it undertook to learn how to meet its customers' functional needs. It was bound to know. It was not merely selling a machine or an apparatus; it was selling an apparatus to perform a function which it advertised as needing its "expert knowledge." A seller of a conveyor for eggs, for apples, for oranges, for golf balls, is bound to know that his system will transport—not spoil—eggs, or apples, or oranges, or golf balls.

The instructions given freed the Construction Company from this obligation, *imposed by law*, to know and to meet the buyer's purpose —unless, of course, that purpose was concealed or withheld in some fraudulent or otherwise improper way from the manufacturer, which is not claimed in this case. It was of the very essence of the manufacturer's undertaking to study and to ascertain the buyer's purposes and needs, and to accomplish them. This is a fundamentally important point. But the instructions threw upon the buyer the burden of showing, affirmatively, that it notified the seller that it wanted this slate transported without substantial change, and that, if substantially changed, it would not be suitable for the use intended. They rest upon the theory that the buyer could not object to a substantial change, in transit, of the material transported, unless it took special pains to say so. They really assert that the presumption is that pneumatic conveying would change—even spoil—the slate and that this presumption must be negatived by the buyer, in order to permit him to avail of an implied warranty.

When the court told the jury that, "if the buyer expected slate to be transferred unchanged, in my opinion he should have said so, or specified in the specifications, or imparted the information somehow to the builder, in order to get the benefit of this implied warranty," he in effect told the jury that there was no duty resting upon the seller to inform itself as to whether substantial change of the slate, while in transit, would render it unsuitable for the buyer's use. The burden was thus put upon the buyer to insure the seller against ignorance as to the effect of change in the slate, while in transit, upon its suitability for the buyer's use. This is an inversion of the respective legal duties resting upon the parties; it overlooks the controlling factor in their relations. It was the seller that advertised that "work of this kind involves a considerable degree of expert knowledge," and asked Bird & Son, Inc., to rely upon its skill and its expert knowledge that its pneumatic system would convey the crushed slate that Bird & Son, Inc., were using, and deliver it at the point of use, fit for the use—which was then laid fully open to the seller's inquiry and examination, and, if it thought necessary, to its experiment. Apparently, both parties were ignorant as to the effect of the pneumatic process on crushed slate; the instructions given made the nonexpert buyer, not the expert seller, legally responsible for that common ignorance.

Moreover, these instructions threw upon the buyer the burden of a change in the material transported, so great as to surprise both parties; it made the nonexpert buyer responsible for the damage arising from a change caused by the method of conveyance which surprised the manufacturer of the system—a result which might have been found

to be due to its lack of the requisite skill, not due to lack of information, as to special or unanticipated need on the part of the buyer. It follows that, even if Bird & Son, Inc., had told the Construction Company that the slate must be conveyed without substantial change, the Construction Company would not have been thus warned against the result that actually accrued. Clearly it was for the manufacturer, not for the buyer, to know the effect of its pneumatic conveyor system upon the buyer's material. Yet the instructions made the buyer responsible, not only for the results which accrued from the manufacturer's alleged (and apparently found) failure to learn that the material must for the buyer's use be transported substantially unchanged, but also for a change wrought in the material, so great that, even if the manufacturer had been warned that substantial change would render the material unsuitable for the buyer's use, it would not have been thus warned of the surprising change that actually occurred.

Analyzed and applied to the facts in this case, the instructions given were little short of caveat emptor. They left no implied warranty of any value to the buyer.

It follows that the first six assignments of error must be sustained; the seventh and eighth thus become of no practical importance.

In each case the judgment of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion, with costs to the plaintiff in error.

JOHNSON, Circuit Judge (dissenting). I cannot agree with the conclusion reached in the majority opinion, nor with all that is said therein in regard to an implied warranty in the case.

The instruction denied and that which was given must be considered in relation to the facts disclosed in this record. The reasoning of the majority opinion treats the rule of implied warranty as one requiring the Construction Company to know what it is evident that neither it nor Bird & Son knew, viz. that the particles of ground slate, when rounded and smoothed by their passage through the conveyor system, could not be made to adhere to the asphalt coated paper upon which it was placed. It is evident that both parties must have been ignorant of this, because it is inconceivable that either would have proceeded with the installation of the system, if this result had been known.

The Construction Company, in the circular which it issued, part of which is set out in the majority opinion, made the following statement:

"In industrial engineering we do not pose as efficiency experts. Our clients are usually well able to determine the broad principles involved in their business, and it is our province to obtain the best results at the least expenditure, by blending our experience and organization with their expert knowledge of their own business."

Samples of crushed slate and soapstone were submitted to it by Bird & Son, and it was asked if it could handle these. Subsequently there were conversations between the parties, and Bird & Son, by letter, asked the Construction Company to "recommend a system which you feel we could use to advantage in unloading our cars." The Construction Company stated that its system could "handle" these materials, and expressed its willingness to guarantee successful operation; but

these statements were made with reference to an unloading system which called for slight handling of the slate compared with that to which it was subjected by the more elaborate system which was afterwards installed. It proposed to furnish this unloading apparatus for less than $6,000 and fully explained the pneumatic process that would be employed. Several days later it received a letter from Bird & Son, stating that the latter had taken up the matter with the office of C. T. Main, engineers, who were preparing specifications for a "much more elaborate system of both unloading and storing."

The office of C. T. Main later submitted specifications for this more elaborate system and asked for bids for its construction, not only from the Construction Company, but from others. This more elaborate system, designed and specified by the engineers of Bird & Son, adopted the suction unloading process contained in the Construction Company's unloading proposal, and added to it a pneumatic system which took the slate from the bottom of the storage bins and blew it at the rate of a mile a minute through an iron pipe which bent and rose 25 feet perpendicularly, then bent again to cross railroad tracks and extended 126 feet into a bell-shaped steel separator, against whose sides the particles of slate were blown, and in which they were whirled about until they settled by gravity into a service bin beneath, from which they were to be drawn and applied to specially prepared paper. Dust collectors along the route were called for in the specifications. The contract for furnishing the materials and labor for the construction of this system according to the specifications of C. T. Main, with certain additions afterwards agreed upon, was awarded to the Construction Company for about $57,000. No representations were made by the Construction Company in regard to the handling of slate by this elaborate system, which was to cost 10 times as much as the little unloading system for which it had submitted a proposal.

Bird & Son knew from correspondence between the parties that the Construction Company had never installed a system for conveying ground slate, and that the materials for the transfer of which it had made installations were coal, ashes, corn, wheat, and coke screenings.

The pneumatic system for both unloading the slate and for conveying it from the storage bins to the service bins had been worked up by the office of Charles T. Main, the engineers employed by Bird & Son, and when these specifications were submitted to the Construction Company for bids, as well as to others, they contained the statement that the contractor was to submit detailed specifications of the apparatus he proposes to furnish, "so that full information will be had from which to judge the value of the apparatus covered by the proposal," and that the specifications submitted by C. T. Main were "to be returned attached to or incorporated complete as a part of the contractor's specifications and in case of nonagreement are to take precedence over the latter."

The whole process of conveying the slate and the means to be used were fully set out in the specifications; there was nothing hidden or mysterious about it. Bird & Son were as well able to form an opinion as to the effect upon ground slate of the blowing and whirling process to which it was to be submitted as was the Construction Company.

Both parties must have known that so soft a material as ground slate could not be drawn from the cars by the pneumatic process into a steel separator and then forced by air pressure through iron or steel pipes, around sharp corners, and into another steel separator, at a velocity of a mile a minute, in order to meet the handling capacity required by the specifications, and whirled about in both separators until its acquired velocity was overcome and it fell by gravity, without the creation of a good deal of dust and a substantial wearing away of this soft material. I think both parties knew this, but did not know that the particles of slate thus worn and smoothed were unfit for use in the manufacture of roofing paper.

The instruction denied, and which the majority opinion holds should have been given, would have held the Construction Company to an implied warranty that the ground slate, after having been subjected to this wearing and smoothing process and reduced in size substantially, would not be unfit for this use, which I think should have been known to Bird & Son, experts in the manufacture of roofing paper, and upon whose expert knowledge of that business the Construction Company had a right to rely, and with which, it stated in its circular, it would combine its organization and experience, not in paper making, but in conveying.

The instruction assigned as error was, in substance, that there was no implied warranty, unless the jury should find that the Construction Company knew, or ought to have known, that the purpose of the system was to transfer the ground slate from the cars to the place where it was to be used, in a substantially unchanged condition.

As applied to the facts in this case and the obvious change which would necessarily take place in the condition of the slate, and as to the extent of which both parties were equally well able to judge, the jury were correctly instructed that, in order to hold the Construction Company upon an implied warranty, they must find that it either knew, or ought to have known, that the slate must arrive at its destination substantially unchanged, in order that it might be successfully used in the manufacture of roofing paper.

Under the admitted facts in this case, knowledge of the general purpose for which slate was to be used would not, in my opinion, be enough to hold the Construction Company to such an implied warranty, unless it knew, or should have known, that the particles of slate could not be used, if substantially reduced in size.

It was stated by counsel at the oral argument of the case that the reason why the slate could not be used was because the sharp edges of the particles were rounded off and smoothed, and would not cling to or sufficiently imbed themselves in the asphalt surface of the paper. The dust created does not seem to have been the chief reason why the slate could not be used. The engineers of Bird & Son, in a letter to the Construction Company, stated that it was useless for the Construction Company to make any further attempts to get rid of the dust, as the plant was useless to Bird & Son, "by reason of the degradation in and change in form of material."

The instruction given did not go far enough, and include that, in order to find an implied warranty, the jury should find that Bird &

Son relied upon the skill and judgment of the Construction Company. But this is not assigned as error, and, as the jury has found that the Construction Company could not be charged with knowledge that the system would convey the ground slate to its destination in a substantially unchanged condition, they in fact found that there was no implied warranty, without determining this question.

As applied to the facts in this case, I think there was no error in the instruction denied or given, and that the judgment of the District Court should be affirmed.